FILED
United States Court of Appeals
Tenth Circuit

May 1, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JACK DEWAYNE NEUGIN,

    Defendant - Appellant.

No. 19-7043

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:18-CR-00059-RAW-1)**
_____

Neil D. Van Dalsem, Assistant Federal Public Defender, (Julia L. O'Connell, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Muskogee, Oklahoma, for Defendant - Appellant.

Linda A. Epperley, Assistant U.S. Attorney, (Brian J. Kuester, U. S. Attorney, and Sarah McAmis, Assistant U.S. Attorney, with her on the brief), Muskogee, Oklahoma, for Plaintiff -Appellee.
_____

Before **HARTZ**, **EBEL**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

Jack Dewayne Neugin pled guilty to being a felon in possession of a firearm and

ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He pled on the

condition that he could appeal the district court's denial of his motion to suppress

evidence—the ammunition and firearm—that police found in the bed of his pickup truck. He argued the officers discovered the evidence during an unconstitutional search under the Fourth Amendment.

The officers were responding to a reported verbal altercation between Mr. Neugin and his girlfriend, Julie Parrish. One of the officers saw ammunition in the back of the couple's pickup truck after he lifted the truck's camper lid to allow Ms. Parrish to retrieve her belongings. The district court concluded the officer was acting "in a lawful position" as a "community caretak[er]." ROA at 39. It found no Fourth Amendment violation.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse. We conclude that (1) the officer conducted a search without a warrant or probable cause, (2) the community caretaking exception to the warrant requirement does not apply, and (3) the inevitable discovery exception to the exclusionary rule does not apply. The evidence seized should have been suppressed.

## I. BACKGROUND

### A. *Factual Background*

Cherokee Nation Deputy Buddy Clinton was dispatched to a restaurant parking lot to respond to a verbal altercation between Mr. Neugin and Ms. Parrish. Their pickup truck was broken down. Deputy Clinton arrived and found Mr. Neugin sitting on the curb. Ms. Parrish was in the restaurant.

While Deputy Clinton and Mr. Neugin talked, Cherokee Nation Sergeant John Wofford arrived. He stayed with Mr. Neugin while Deputy Clinton went inside the

2

restaurant to help Ms. Parrish arrange a ride. Ms. Parrish told Deputy Clinton she needed to retrieve her belongings, and Deputy Clinton accompanied her to the truck. *Id.* at 60. He and Sergeant Wofford stood at the back of the truck. *Id.* Deputy Clinton "had Ms. Parrish stand on the right" and "Mr. Neugin stand on the left" "so there was no interaction." *Id.* Mr. Neugin objected to Ms. Parrish's taking his grandmother's jewelry. Supp. ROA at 7. Without asking, Deputy Clinton opened the lid of the "camper" attached to the back of the truck. ROA at 60, 68.[1]

As he opened the camper, Deputy Clinton looked inside and saw "a large bucket containing several rounds of ammunition." *Id.* at 60. He asked who owned the ammunition, and Mr. Neugin said he obtained it from a deceased family member. Deputy Clinton set the bucket aside while Ms. Parrish continued to remove items from the truck.

Deputy Clinton requested dispatch to run a background check on Mr. Neugin, which showed Mr. Neugin was a felon. Deputy Clinton and Sergeant Wofford determined it was unlawful for Mr. Neugin to possess ammunition or firearms.

Deputy Clinton asked Mr. Neugin if he had a firearm, and Mr. Neugin said no. Mr. Neugin declined Deputy Clinton's request for permission to search the truck, and explained he purchased the truck for Ms. Parrish.

---

[1] The camper was a hard shell covering the truck's bed.

3

Deputy Clinton asked Ms. Parrish whether Mr. Neugin had a firearm. She said he had a shotgun in the truck and had threatened her with it the evening before. Ms. Parrish told Deputy Clinton that she and Mr. Neugin owned the truck, and she consented to a search of the vehicle.[2]

When Deputy Clinton returned to the truck, he saw the stock of a firearm protruding from under a suitcase in the back. He asked Mr. Neugin if the firearm belonged to him, and Mr. Neugin said he did not know where it came from. Deputy Clinton removed the firearm, which turned out to be a shotgun, and Mr. Neugin was arrested. The truck was impounded and inventoried.

## B. *Procedural Background*

Mr. Neugin was indicted for firearm and ammunition possession by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He moved to suppress the evidence seized from the truck as the fruit of an unlawful search. After an evidentiary hearing at which Deputy Clinton testified, a magistrate judge recommended denial of the motion. The district court agreed.

The district court reasoned that Deputy Clinton acted as a "community caretak[er]" when he opened the camper and therefore did not commit an unconstitutional search. ROA at 39. It found that the ammunition was in plain view once the camper was

---

[2] Deputy Clinton testified that Mr. Neugin said he bought the truck for Ms. Parrish. Mr. Neugin had the keys, but the seller had not yet transferred the title. The Government does not contest Mr. Neugin's standing to bring his Fourth Amendment challenge.

4

open and became subject to seizure when Deputy Clinton learned Mr. Neugin was a felon. It also reasoned that once Deputy Clinton saw the ammunition, learned Mr. Neugin was a felon, heard about Mr. Neugin's threatening Ms. Parrish with the shotgun, and saw the shotgun, he had probable cause to arrest Mr. Neugin and seize the evidence. Alternatively, because the truck was impounded and inventoried, the court said discovery of the evidence was inevitable.

Mr. Neugin entered a conditional guilty plea and was sentenced to 60 months in prison followed by three years of supervised release. He appealed the district court's denial of the motion to suppress.

## II.  DISCUSSION

### A.  *Standard of Review*

In reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous. *United States v. Moore*, 795 F.3d 1224, 1228 (10th Cir. 2015). We "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers," *Ornelas v. United States*, 517 U.S. 690, 699 (1996), and view the evidence in the light most favorable to the government, *Moore*, 795 F.3d at 1228. We review legal questions de novo. *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017).

5

B. *Legal Background – Fourth Amendment*

This case concerns three areas of Fourth Amendment law: (1) what constitutes a search, (2) the community-caretaking exception to the warrant requirement, and (3) the inevitable discovery exception to the exclusionary rule. We address each in turn.

### 1. Search

The Fourth Amendment protects people from unreasonable government searches of their "persons, houses, papers, and effects." U.S. Const. amend. IV. The government conducts a search "when it infringes on a reasonable expectation of privacy." *United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). To establish a Fourth Amendment search, a defendant must show both "a subjective expectation of privacy in the object of the challenged [intrusion]," and that "society [is] willing to recognize that expectation as reasonable." *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *accord Reeves v. Churchich*, 484 F.3d 1244, 1254 (10th Cir. 2007).

"[A]n individual's privacy interest in her automobile is constitutionally protected." *Romo v. Champion*, 46 F.3d 1013, 1017 (10th Cir. 1995) (citing *California v. Carney*, 471 U.S. 386, 390 (1985)). "[T]his protection clearly extends to a car's trunk." *Id.* It is, therefore, "well settled that a trooper's opening of a car trunk is a search . . . ." *United States v. Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011).

### 2. The Warrant Requirement and the Community-Caretaking Exception

A search typically requires a warrant based on probable cause. *See United States v. Dalton*, 918 F.3d 1117, 1127 (10th Cir. 2019). "Searches conducted without a warrant

are *per se* unreasonable under the Fourth Amendment—subject only to a few 'specifically established and well-delineated exceptions.'" *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).[3]  Although "the defendant bears the burden of proving whether and when the Fourth Amendment was implicated," *Hernandez*, 847 F.3d at 1263 (quotations omitted), "[t]he government then bears the burden of proving that its warrantless actions were justified [by an exception]," *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994).  If the government establishes that an exception to the warrant requirement applies, the search is constitutional.  *See United States v. Maestas*, 2 F.3d 1485, 1491-92 (10th Cir. 1993).  The Government relies on the community-caretaking exception here.[4]

The community-caretaking exception allows the government to introduce evidence obtained through searches that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  *Cady v.*

---

[3] Under the automobile exception to the warrant requirement, "police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."  *United States v. Stewart*, 473 F.3d 1265, 1270 (10th Cir. 2007) (quotations omitted).  Deputy Clinton did not have probable cause to open the camper, so the automobile exception does not apply.

[4] The Government also invokes the plain view exception to the warrant requirement.  When an officer "is lawfully positioned in a place from which an object can be plainly viewed," . . . the "incriminating character of the object is immediately apparent," and "the officer has a lawful right of access to the object," the officer may seize the object without a warrant.  *United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014) (quotations omitted).  As we explain below, however, the plain view exception does not apply because the community-caretaking exception does not apply.

*Dombrowski*, 413 U.S. 433, 441 (1973).[5] "Noninvestigatory searches of automobiles pursuant to this function . . . do not offend Fourth Amendment principles so long as such activities are warranted in terms of state law or sound police procedure, and are justified by concern for the safety of the general public . . . ." *United States v. Lugo*, 978 F.2d 631, 635 (10th Cir. 1992) (quotations omitted).

The government must also point to "specific and articulable facts which reasonably warrant an intrusion into the individual's liberty," and must show that "the government's interest . . . outweigh[s] the individual's interest in being free from arbitrary governmental interference." *United States v. Garner*, 416 F.3d 1208, 1213 (10th Cir. 2005) (quotations omitted and alterations incorporated). Although officers are entitled to "some latitude in undertaking their community caretaking role," their actions must be "reasonably related in scope" to the underlying justification. *Lundstrom v. Romero*, 616 F.3d 1108, 1123 (10th Cir. 2010); *see also Garner*, 416 F.3d at 1213 (explaining that the "scope [of a community-caretaking detention] must be carefully tailored to its underlying justification").

The Supreme Court applied the community-caretaking exception to the warrant requirement when law enforcement, for safety purposes, removed a defendant's damaged car from the highway and later searched the car, including the trunk, under standard

---

[5] Although the district court reasoned that Deputy Clinton "was not conducting a search" because he was community caretaking, ROA at 39, we have treated community caretaking as an exception to the warrant requirement. *See, e.g.*, *United States v. Thomson*, 354 F.3d 1197, 1200 n.1 (10th Cir. 2003).

police procedure. *Cady*, 413 U.S. at 448. We applied the exception when officers detained a man for questioning after finding him lying in a field and possibly in need of medical help. *Garner*, 416 F.3d at 1214.

By contrast, when an officer found cocaine under an interior door panel while conducting an inventory search of a damaged car, we declined to apply the exception because the officer testified to no public danger justifying his removal of the panel. *Lugo*, 978 F.2d at 636. Because the officer cited no suspicion that the compartment contained a weapon, opening it was not community caretaking. *Id.* We also declined to apply the exception when, in response to a neighbor's call regarding a loud argument between a man and his spouse, police ordered the man to step outside and arrested him when he declined. *Storey v. Taylor*, 696 F.3d 987, 996 (10th Cir. 2012). We explained that "no specific and articulable facts" indicated that seizing the man was "necessary to protect the safety of [him], his wife, the officers, or others." *Id.* (quotations omitted). We concluded that, "[a]bsent additional facts indicating a greater possibility of violence, a loud argument between spouses does not suffice to justify a warrantless seizure within the home." *Id.* at 997.

### 3. The Exclusionary Rule and the Inevitable Discovery Exception

When the government obtains evidence though an unconstitutional search, the evidence is inadmissible under the exclusionary rule unless an exception applies. *Mapp v. Ohio*, 367 U.S. 643, 655-58 (1961); *United States v. Knox*, 883 F.3d 1262, 1273 (10th Cir. 2018). "In addition, a defendant may also suppress any other evidence deemed to be

'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). One of the exceptions to the exclusionary rule is the inevitable discovery doctrine. *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

"Although a search may violate the Fourth Amendment, the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means." *United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000). "[T]he government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1165 (10th Cir. 1995). The government may carry its burden by showing that if police officers had not violated the Fourth Amendment, they still would have discovered the evidence through a lawful inventory search of the car. *See United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992).

"In determining whether the government has met its burden of proof, we consider 'demonstrated historical facts,' not 'speculative elements.'" *United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003) (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)); *accord United States v. Owens*, 782 F.2d 146, 153 (10th Cir. 1986) ("[T]he inevitable discovery exception to the exclusionary rule cannot be invoked because of [a] highly speculative assumption of 'inevitability.'").

10

C. *Analysis*

We first analyze whether Deputy Clinton conducted a search when he opened the camper and looked in. Finding that he did, we next determine whether the evidence is admissible under the community-caretaking exception to the warrant requirement or the inevitable discovery exception to the exclusionary rule. Because neither exception applies, we reverse the district court's denial of Mr. Neugin's motion to suppress.

1. **Search**

Deputy Clinton searched the back of the truck when he opened the camper and examined its contents. *See Ludwig*, 641 F.3d at 1250. The district court concluded, ROA at 37-38, and the Government does not contest, that Mr. Neugin had a reasonable expectation of privacy in the inside of the pickup truck. By covering the truck's bed with a camper shell, Mr. Neugin manifested an expectation that the contents inside would remain hidden. As with a closed trunk, "society [would be] willing to recognize that expectation as reasonable." *Ciraolo*, 476 U.S. at 211; *see also Romo*, 46 F.3d at 1017; *Ludwig*, 641 F.3d at 1250. Deputy Clinton intruded on that privacy expectation when he lifted the latch and looked in. In so doing, he obtained evidence used to charge Mr. Neugin with a crime. He therefore conducted a search under the Fourth Amendment.[6]

---

[6] The Government contends that when Deputy Clinton "opened the back of the camper, he was not intending to initiate a search." Aplee. Br. at 8. *United States v. Jones*, 565 U.S. 400 (2012), ostensibly supports this argument. In *Jones*, the Supreme Court said law enforcement's attaching a GPS monitor to the outside of the defendant's car was a search under the Fourth Amendment because the officer "physically occupied private property for the purpose of obtaining information." *Id.* at 404. In a footnote

## 2. **Community-Caretaking Function**

The district court held that opening the camper was constitutional because Deputy

Clinton did so in a community-caretaking role.  Mr. Neugin argues that the community-

---

unrelated to its holding, the *Jones* Court observed that an "invasion of privacy[] is not alone a search unless it is done to obtain information." *Id.* at 408 n.5.

For several reasons, we decline to consider, as a possible alternative ground to affirm, a theory that Deputy Clinton did not conduct a search because he did not intend "to obtain information" when he opened the camper. *Id.*

First, the Government does not cite *Jones* in its brief, much less develop an argument based on the footnote.  *See Harvey v. United States*, 685 F.3d 939, 950 n.5 (10th Cir. 2012) ("In exercising [our] discretion [to affirm on an alternative ground] we consider whether the ground was fully briefed and argued here and below." (quotations omitted)); *United States v. Carloss*, 818 F.3d 988, 992 n.2 (10th Cir. 2016) (declining to consider an unargued search theory).

Second, the district court made no findings as to whether Deputy Clinton intended to obtain information when he opened the camper.

Third, under longstanding Fourth Amendment law, "[t]he subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment." *Bond v. United States*, 529 U.S. 334, 339 n.2 (2000).

Fourth, after *Jones* was decided, we recognized in *Ackerman*, 831 F.3d at 1307, that the "reasonable expectation of privacy" test remains "one way to determine if a constitutionally qualifying 'search' has taken place."  Consistent with *Ackerman*, the Supreme Court has clarified that "[t]he *Katz* reasonable-expectations test has been *added to*, not *substituted for*, the [*Jones*] understanding." *Florida v. Jardines*, 569 U.S. 1, 11 (2013) (quotations omitted).

Fifth, *Jones* involved very different circumstances from this case, and the Court declined to consider whether officers invaded the defendant's expectation of privacy. 565 U.S. at 406.  Because the reach of *Jones* is unclear, its footnote dictum that an "invasion of privacy[] is not alone a search unless it is done to obtain information," 565 U.S. at 408 n.5, "do[es] not appear to be of the considered sort that would compel us to" apply it here, *Tokoph v. United States*, 774 F.3d 1300, 1304 (10th Cir. 2014) *as amended on reh'g* (Jan. 26, 2015).

Without adequate argument from the Government, further direction from the Supreme Court, and for the other stated reasons, we decline to consider affirming on this alternative ground.

12

caretaking exception to the warrant requirement does not apply simply because Deputy Clinton was "trying to help." Aplt. Br. at 27. We agree with Mr. Neugin.

The Government has not shown that "state law or sound police procedure" warranted opening the camper. *Lugo*, 978 F.2d at 635 (quotations omitted). Nor has it demonstrated how opening the camper was "justified by concern for the safety of the general public." *Id.* (quotations omitted). Ms. Parrish could have opened the camper herself, and the Government fails to explain how her doing so might have created any danger. It identifies "no specific and articulable facts" demonstrating Deputy Clinton needed to stand behind the tailgate, lift the camper's hatch, or look into the bed of the truck. *Storey*, 696 F.3d at 996 (quotations omitted). Nor was opening the camper "necessary to protect" Ms. Parrish, Mr. Neugin, the officers, or others. *Id.* (quotations omitted).

The Government points out that Deputy Clinton needed to "separate a feuding couple." Aplee. Br. at 12. But this does not explain why he needed to open the camper or look inside.[7] He and Sergeant Wofford could have remained with Mr. Neugin nearby

---

[7] The dissent claims that "[i]f Clinton was to mediate the situation, and to prevent new disputes from escalating animosity, he could not just stand by and allow Ms. Parrish to rummage through the belongings in the vehicle without being observed." Dissent at 4. It cites Mr. Neugin's "concern that Ms. Parrish would take his grandmother's jewelry from the vehicle." *Id.*

But the record does not bear this out. First, the Government points to no evidence that Mr. Neugin—who was sitting peacefully on the curb when police arrived—would have turned to violence with two officers on the scene. Second, the officers said they were not concerned about Ms. Parrish's taking Mr. Neugin's property. *See* ROA at 62 ("[Sergeant Wofford] made the statement that we were not going to worry about the jewelry, or release it to Ms. Parrish. . . . Right now our main concern was just [letting her

while Ms. Parrish retrieved her belongings from the truck.[8]  Nor was there evidence the

couple was feuding at this time.

The dissent emphasizes the general importance of law enforcement's community

caretaking role, observing that "[p]olice must frequently care for those who cannot care

for themselves: the destitute, the inebriated, the addicted and the very young."  Dissent at

1 (quoting *Debra Livingston, Police, Community Caretaking, and the Fourth*

*Amendment*, 1998 U. Chi. Legal F. 261, 272 (1998)).  We agree.  But Ms. Parrish was

---

get] her personal belongings . . . [and preventing] more altercation.").  Nor would
preventing Ms. Parrish from taking jewelry have supported the community-caretaking
exception to the warrant requirement.

[8] The dissent notes that "the test of reasonableness in this context is not whether
[the officer] chose the least intrusive alternative."  Dissent at 5.  It quotes *Cady*: "The fact
that the protection of the public might, in the abstract, have been accomplished by 'less
intrusive' means does not, by itself, render the search unreasonable."  413 U.S. 433, 447
(1973).  But the words "by itself" show that *Cady* does not foreclose consideration of an
officer's failure to pursue nonintrusive means, especially when the intrusion offered no
additional public protection.  *See United States v. Sanders*, 796 F.3d 1241, 1251 (10th
Cir. 2015) (declining to apply the community-caretaking exception when police
impounded an arrestee's car from a store parking lot "without offering her the
opportunity to make alternative arrangements").
    Deputy Clinton could have achieved his alleged community-caretaking purpose—
preventing further altercation—simply by standing with Mr. Neugin nearby, or by
standing back and letting Ms. Parrish open the camper.  Instead, he opted to invade Mr.
Neugin's reasonable expectation of privacy, despite clear noninvasive alternatives.  *See*
*Garner*, 416 F.3d at 1213 (explaining that a community-caretaking intrusion "must be
carefully tailored to its underlying justification.").

none of those.  She was perfectly capable of retrieving her belongings without Deputy

Clinton's "help" in opening the camper and looking inside.[9]

Nor do we share the dissent's view that the invasion of privacy was so "de

minimis" as to except it from the Fourth Amendment's protection.  Dissent at 5.  Deputy

Clinton intruded into Mr. Neugin's enclosed truck without asking, saw contraband, and

made an arrest.  His asserted benign motive does not render this reasonable as to Mr.

Neugin.  An invasion of privacy is not reasonable simply because the officer assumed his

actions were inoffensive.  *See, e.g.*, *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404

(2006) (In assessing reasonableness, "[t]he officer's subjective motivation is irrelevant").

The community-caretaking exception thus does not apply to Deputy Clinton's Fourth

Amendment violation.[10]

3. **Inevitable Discovery**

The Government argues that even if opening the camper was unconstitutional, the

evidence should not have been suppressed because the truck inevitably would have been

impounded and searched.  We disagree.

---

[9] The dissent claims Deputy Clinton needed to "observe" or "keep an eye on" Ms. Parrish as she retrieved her belongings.  Dissent at 3, 4, 5.  But (a) "observing" and (b) physically opening the camper and looking in are two different things.

[10] It follows that the plain view exception does not apply because Deputy Clinton's violation of the Fourth Amendment enabled him to see the ammunition.  *See Horton v. California*, 496 U.S. 128, 136 (1990) (explaining the plain view exception applies only when the officer complies with the Fourth Amendment "in arriving at the place from which the evidence [is] plainly viewed").

15

The Government has not shown that it would have discovered the ammunition and shotgun if Deputy Clinton had not opened the camper in violation of the Fourth Amendment. If Deputy Clinton had not opened the camper, we cannot say he inevitably would have seen the ammunition, run a criminal history check, or found the gun. Without the violation, therefore, Mr. Neugin would not inevitably have been arrested. And without the arrest, the truck would not inevitably have been impounded and searched. The truck was in a restaurant parking lot, and Mr. Neugin could have called his own towing company or a mechanic. The inevitable discovery exception thus does not apply. *See Owens*, 782 F.2d at 153 ("[T]he inevitable discovery exception to the exclusionary rule cannot be invoked because of [a] highly speculative assumption of 'inevitability.'").[11]

---

[11] The dissent contends that "even if Ms. Parrish were the one who opened the lid, [Deputy Clinton] would [have] need[ed] to stand close to be able to observe what she took and be sure that she did not harm any property." Dissent at 5. But any suggestion that the officers would inevitably have discovered the evidence even if Deputy Clinton had not opened the camper does not help the Government.

First, the Government did not brief this alternative inevitable discovery theory.

Second, even if it had, that theory would not provide a ground to affirm. Although Ms. Parrish *might* have opened the camper and one of the officers *might* have seen the ammunition, inevitable discovery cannot be based on such speculation. *See Owens*, 782 F.2d at 153.

Third, there is reason to doubt Deputy Clinton would have seen the ammunition had Ms. Parrish opened the camper. The bucket of ammunition was tucked against the inside of the truck's tailgate. ROA at 71. Deputy Clinton may not have seen it had he stood back and let Ms. Parrish approach the truck so she could open the lid. And, to keep the ammunition hidden, Ms. Parrish might have refrained from opening the camper with Deputy Clinton watching.

16

### III. **CONCLUSION**

Deputy Clinton unconstitutionally searched the truck when he opened the camper and looked in.  He exceeded any community-caretaking role, and the police would not have inevitably discovered the evidence absent the Fourth Amendment violation.  Because the violation caused the discovery of the ammunition and firearm, that evidence is fruit of the poisonous tree and should have been suppressed.  We therefore reverse.[12]

---

[12] The Government argued in district court that Ms. Parrish expressly consented to a search of the truck when Deputy Clinton asked.  But even if she did and had the authority to consent, she told the officers they could search only *after* Deputy Clinton opened the camper and found the ammunition.  Her consent thus would not have validated the initial unconstitutional search.

As to whether Mr. Neugin implicitly consented to Deputy Clinton opening the camper, he accompanied the officers to the truck so Ms. Parrish could gather her things.  He stood next to the officers when Deputy Clinton lifted the latch.  And he "made no attempt to stop the officers—through words or otherwise." *United States v. Jones*, 701 F.3d 1300, 1321 (10th Cir. 2012) ("[T]he Fourth Amendment requires only that the police reasonably believe the search to be consensual." (quotations omitted)).  Still, we decline to affirm on this alternative ground because the Government disclaimed the argument and the parties did not develop the record regarding the issue. *See* Oral Arg. at 24:55-27:00.

19-7043, *United States v. Neugin*

**HARTZ,** Circuit Judge, dissenting.

I respectfully dissent.  In my view the district court correctly ruled that Deputy

Clinton acted lawfully under the community-caretaker doctrine.

This is an important decision.  It has implications for a great deal of the work of

law-enforcement officers.  As summarized by then-professor Livingston:

> Community caretaking denotes a wide range of everyday police activities
> undertaken to aid those in danger of physical harm, to preserve property, or
> to create and maintain a feeling of security in the community.  It includes
> things like the mediation of noise disputes, the response to complaints
> about stray and injured animals, and the provision of assistance to the ill or
> injured.  Police must frequently care for those who cannot care for
> themselves: the destitute, the inebriated, the addicted and the very young.
> They are often charged with taking lost property into their possession; they
> not infrequently see to the removal of abandoned property.  In those places
> where social disorganization is at its highest, police are even called upon to
> serve as surrogate parent or other relative, and to fill in for social workers,
> housing inspectors, attorneys, physicians and psychiatrists.

Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U.

Chi. Legal F. 261, 272 (ellipses, footnotes, and internal quotation marks omitted); *see*

*also id.* at 302 (identifying the responsibilities "to search for missing persons, *to mediate*

*disputes*, . . . to aid the ill or injured [,] . . . [and] to provide services in an emergency" as

"a core set of community caretaking activities that have a longstanding tradition and that

have achieved relatively unquestioned acceptance in local communities" (emphasis

added)).

Courts should be careful about constraining the reasonable conduct of police

officers in performing these functions.  To be sure, some constraints are essential.  There

must be strong reasons to justify entry into a home without a warrant. *See, e.g.*, *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003) (unlawful warrantless removal of child from home by social worker). Programmatic searches and seizures ostensibly for community-caretaking purposes (such as traffic checkpoints and inventory searches) must be examined to make sure that they are not pretexts for crime control. *See Brigham City*, 547 U.S. at 405. And more generally, tighter restrictions may be required when there is an overlap between community-caretaking functions and law-enforcement functions. But rather than trying to pigeonhole each example of community caretaking into doctrine that has been applied to one particular species of community caretaking (such as protecting property in an automobile when the driver is no longer present, or entering a home to protect inhabitants), each type of intrusion should be examined under a general Fourth Amendment reasonableness standard. *See New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985) ("[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable[; and] what is reasonable depends on the context within which a search takes place."). *See generally* Livingston, *supra.* I agree with the First Circuit's formulation: "The community caretaking doctrine gives officers a great deal of flexibility in how they carry out their community caretaking function. The ultimate inquiry is whether, under the circumstances, the officer acted within the realm of reason." *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 75 (2007) (citation and internal quotation marks omitted).

2

One important factor is whether any law-enforcement purpose is implicated. If there is little likelihood of an officer's using the community-caretaking doctrine as a pretext for criminal investigation, there is no need for prophylactic rules to prevent abuse. In the case before us, the police conduct in question occurred before anyone would have been thinking about criminal misconduct. There can be no question that Deputy Clinton's sole possible purpose before he saw the ammunition was to mediate a dispute. The court's reasonableness inquiry should be pursued in that light.

Clinton's conduct was eminently reasonable. Defendant and Ms. Parrish had been traveling together and were having a dispute when their vehicle broke down. Clinton's role was to separate them amicably without incident. Some of Ms. Parrish's belongings were in the vehicle, and she needed to get them. I would have thought that common sense (and standard procedure) would require Clinton to keep an eye on her while she retrieved her things, so there would be no question about what she took and whether she damaged any of his property in the process. In any event, there were specific reasons to be concerned about such matters in this case. In Clinton's initial conversation with Defendant, Defendant claimed that during his argument with Ms. Parrish in the parking lot she had thrown one of his cell phones to the ground, breaking the screen, and took the other into the gift shop.[1] When Clinton asked her about the cell phones, she said that the

---

[1] This information comes from Clinton's probable-cause affidavit in the tribal prosecution. The affidavit was an exhibit at the evidentiary hearing before the magistrate judge. Although it was not formally admitted as evidence, apparently everyone treated it as evidence. Defendant cites it in his opening brief on appeal.

3

cell phone she had was her own; she admitted throwing a cell phone of Defendant's at him, saying that was to keep him from following her into the gift shop, but she said that the screen had already been broken. Later, Defendant expressed concern that Ms. Parrish would take his grandmother's jewelry from the vehicle. She said that she did not have any jewelry belonging to his grandmother. (The officers ultimately decided that he should retain the jewelry for the time being.) If Clinton was to mediate the situation, and to prevent new disputes from escalating animosity, he could not just stand by and allow Ms. Parrish to rummage through the belongings in the vehicle without being observed. Even if no personal violence was likely, the community-caretaking exception should authorize reasonable actions to prevent the theft or destruction of property.[2]

In this context, it was proper for Clinton to open the lid of the camper shell. His duty was to prevent any further problems. *See Brigham City*, 547 U.S. at 406 ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided."); *cf. Henderson v. City of Simi Valley*, 305 F.3d 1052, 1060 (9th Cir. 2002) (officers properly accompanied daughter in retrieving her property from mother's home; "[t]hey merely stood by to prevent a breach of the peace").

---

[2] The majority opinion asserts that "the officers said they were not concerned about Ms. Parrish's taking Mr. Neugin's property." Maj. Op. at 13 n.7. But properly understood, the testimony cited in support of that proposition was only that the officers were not going to resolve at that time who owned the jewelry. They were in fact concerned about Ms. Parrish's taking the jewelry and therefore required her to leave it for the time being. In any event, the officers' subjective state of mind is irrelevant.

4

The lid was going to be opened anyway if Ms. Parrish was to obtain her possessions. The majority opinion acknowledges that "Ms. Parrish could have opened the camper herself." Maj. Op. at 13. Clinton's opening the lid established that he was in control of the situation, a control that was useful, and perhaps essential, to keeping the parties calm. And even if Ms. Parrish were the one who opened the lid, he would need to stand close to be able to observe what she took and be sure that she did not harm any property. (After all, Defendant had already accused her of damaging one of his cell phones, claiming that she owned the other, and claiming his grandmother's jewelry.) His being the one to open the lid was in itself only a de minimis invasion of anyone's property or privacy interests. Doing so was constitutionally permissible. *See T.L.O.*, 469 U.S. at 337 ("The determination of the standard of reasonableness governing any specific class of searches requires balancing the need to search against the invasion which the search entails." (internal quotation marks omitted)).

In any event, even if Deputy Clinton could have been a bit more sensitive to the parties' privacy and property rights in performing his duties, the test of reasonableness in this context is not whether he chose the least intrusive alternative. As the Supreme Court said in *Cady v. Dombrowski*, the leading Supreme Court decision on community caretaking, "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." 413 U.S. 433, 447 (1973). I do not think it advances the purposes of the Fourth Amendment or furthers respect for the Constitution to say that it would have been fine for Deputy Clinton to let Ms. Parrish lift the latch and then watch her every move

5

while in the truck but it would violate the Constitution for him to take charge and lift the latch himself.

Because I think that Deputy Clinton did not act unreasonably in his efforts to calm a domestic dispute, I would affirm the judgment below.