**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**March 7, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TYRELL BRAXTON,

    Defendant - Appellant.

No. 21-1149

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CR-00037-RM-1)**

_____

Meredith Esser, Assistant Federal Public Defender, Denver, Colorado (Virginia L. Grady, Federal Public Defender, with her on the briefs), for Defendant - Appellant.

Wayne Paugh, Assistant United States Attorney, Denver, Colorado (Cole Finegan, United States Attorney, with him on the brief), for Plaintiff - Appellee.

_____

Before **HARTZ**, **SEYMOUR**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

Law enforcement searched Tyrell Braxton's backpack after arresting him and found a gun. Facing several criminal charges, Braxton moved to suppress the gun. The government conceded that the warrantless search was not a valid search incident to arrest. But it invoked the inevitable-discovery doctrine to avoid suppression of the

illegally obtained evidence, contending that—assuming the illegal search incident to arrest had not occurred—law enforcement would have validly impounded the backpack as a matter of community caretaking and then searched it pursuant to a standardized policy mandating inventory searches of seized property. The district court agreed with the government and denied the motion to suppress.

But the government's stated community-caretaking interest in safeguarding Braxton's personal property by impounding it is significantly undercut by the presence of an individual who arrived on the scene at Braxton's request and repeatedly asked to take possession of the backpack throughout the arrest process. The government's explanation for why the officers could have properly refused this individual's requests is not persuasive. Nor is it dispositive, on these facts, that Braxton himself did not ask the officers to turn the backpack over. Thus, the government failed to meet its burden to show that law enforcement would have validly retained the backpack, and the inevitable-discovery doctrine does not apply to excuse application of the exclusionary rule to suppress evidence discovered during the illegal search. We accordingly reverse the district court's order refusing to suppress the gun and remand for further proceedings.

## Background

A Denver police officer monitoring a camera installed in a high-crime area saw Braxton exchange drugs for cash. Officers arrived on the scene and arrested Braxton. As the district court noted, the details of the arrest are not in dispute because one officer's bodycam captured the arrest on video.

2

The video shows that at the moment he was handcuffed, Braxton was wearing a black backpack with a repeating "Emporio Armani" design on it, which the officers removed and placed on the sidewalk. One officer then patted Braxton down and discovered suspected crack cocaine and $183 in cash in Braxton's pockets. During the patdown, Braxton called out, "Hey, get my girl, my girl. Tan! Tell her to come here!" Supp. R. at 1:51–1:56.

Less than 30 seconds later, a woman—later identified as Braxton's girlfriend, Tanyrah Gay—approached the officers, and Braxton instructed her, "Get the money so you can bond me out." *Id.* at 2:18–2:23. Gay then asked the officers, "Can I get his bag?" *Id.* at 2:24–2:26. The officers responded in the negative. Gay stood by for a little over a minute while one officer continued searching Braxton. Then, as one officer walked away with Braxton and another officer picked up the backpack, Gay again asked, "I can't take my backpack?" *Id.* at 3:38–3:40. The officer immediately responded with a curt "nope." *Id.* at 3:40–3:41.

Gay followed as one officer escorted Braxton to a patrol car and another carried the backpack. As Braxton was getting into the patrol car, he said, "She needs the money, man." *Id.* at 4:10–4:12. Gay then said, "I'm in a hotel. Please give me the money at least. I'm in a hotel." *Id.* at 4:13–4:18. Before Gay could finish, the answer again was an immediate "nope." *Id.* at 4:16. Gay then asked if the officers would write her number down; they told her they would "get to that in a second." *Id.* at 4:38–4:40.

3

One officer placed the backpack on the hood of the patrol car and searched it. As the officer dug through the backpack's contents, he found a loaded gun with a pink handle. Before the officer completed the search of the backpack, Gay asked him if she could retrieve her bus pass and identification from the backpack. The officer said they could "talk about that in a second." *Id.* at 7:15–7:16. About 20 seconds later, after the officer placed the gun into an evidence bag and into the front of the patrol vehicle, the bodycam footage ends.

Based on this event, the government charged Braxton with possession of a weapon in furtherance of drug trafficking, possession of crack cocaine with intent to distribute, and felon in possession of a weapon. Braxton moved to suppress the gun, arguing that the warrantless search of his backpack was not justified as a search incident to arrest under this court's recent precedent. *See United States v. Knapp*, 917 F.3d 1161 (10th Cir. 2019) (holding that search of arrestee's purse was not justified as search incident to arrest because arrestee could not access weapons or destroy evidence within purse at time of arrest).

The government conceded that the search was not a valid search incident to arrest under *Knapp*. But it argued that the gun should not be suppressed because law enforcement would have inevitably discovered it after impounding the backpack and conducting an inventory search. That is, the government reasoned, had the officer not searched the backpack at the scene, he would have been obligated to take the backpack to the station to prevent theft and to protect the community in case the backpack contained dangerous items. And once at the station, the government

4

continued, standard policy required an inventory search that would have revealed the gun. The government supported its position with testimony from the officer who searched Braxton's backpack.

The district court agreed with the government and denied the motion to suppress. Braxton eventually entered a conditional guilty plea to possessing a firearm in furtherance of a drug-trafficking crime, and the district court sentenced him to 60 months in prison and three years of supervised release.[1]

Braxton now appeals the suppression ruling.

### Analysis

Our review of the overall reasonableness of a search or seizure is de novo, though we accept the district court's factual findings unless clearly erroneous and view the evidence in the light most favorable to the district court's findings. *Knapp*, 917 F.3d at 1165; *see also United States v. Cook*, 599 F.3d 1208, 1213 (10th Cir. 2010).

"The Fourth Amendment's prohibition of 'unreasonable searches and seizures' means that police generally cannot conduct a search or make a seizure absent a warrant." *United States v. Kendall*, 14 F.4th 1116, 1122 (10th Cir. 2021) (citation omitted) (quoting U.S. Const. amend IV). "A warrantless search or seizure is reasonable only 'if it falls within a specific exception to the warrant requirement.'"

---

[1] Braxton also pleaded guilty to a separate count of felon in possession of a firearm based on events that occurred on a different date. The district court imposed a consecutive 12-month sentence for this additional count (and a concurrent three-year term of supervised release), bringing Braxton's prison sentence to 72 months in total.

*Id.* at 1121–22 (quoting *United States v. Venezia*, 995 F.3d 1170, 1174 (10th Cir. 2021)). These exceptions include, among others, searches incident to arrest, searches and seizures justified by a noninvestigatory community-caretaking rationale, and searches conducted for administrative inventory purposes. *See Knapp*, 917 F.3d at 1165 (discussing exception for searches incident to arrest); *United States v. Neugin*, 958 F.3d 924, 931 (10th Cir. 2020) (explaining community-caretaking exception); *Kendall*, 14 F.4th at 1124 (describing exception for inventory searches). It is the government's burden to establish that an exception to the warrant requirement applies. *Neugin*, 958 F.3d at 930.

If law enforcement searches or seizes without a warrant or applicable warrant exception and thus "obtains evidence th[r]ough an unconstitutional search, the evidence is inadmissible under the exclusionary rule." *Id.* at 931. But like the warrant requirement, the exclusionary rule is also subject to some exceptions, one of which is the inevitable-discovery doctrine. *Id.* at 932. Under this doctrine, the exclusionary rule does not apply if the government can prove by a preponderance that "the evidence inevitably would have been discovered by lawful means." *Id.* (quoting *United States v. Souza*, 223 F.3d 1197, 1202 (10th Cir. 2000)). The parties agree that the inevitable-discovery doctrine requires a counterfactual inquiry into what "would have" happened under lawful circumstances.[2] *Id.* At the same time, "'[i]n

---

[2] Because we rule for Braxton on another ground, we need not address his argument that law enforcement violated the Fourth Amendment because the officer testified that he *did* search the backpack with an investigatory motive, under the facts as they occurred.

determining whether the government has met its burden of proof, we consider "demonstrated historical facts," not "speculative elements."'" *Id.* (quoting *United States v. White*, 326 F.3d 1135, 1138 (10th Cir. 2003)).

Here, the government concedes that the warrantless search of the backpack was not justified by the warrant exception for searches incident to arrest. But it contends that the inevitable-discovery exception to the exclusionary rule should apply because the officers would have eventually conducted a valid warrantless search of the backpack via two other exceptions to the warrant requirement: community caretaking and inventory. Specifically, the government argues that the officers would have impounded the backpack under a community-caretaking rationale to protect Braxton's property rather than leaving it vulnerable to theft on the public sidewalk where Braxton was arrested. *See, e.g.*, *Venezia*, 995 F.3d at 1180 ("Certainly, an abandoned vehicle on a public highway may be at risk of theft or vandalism, and thus may be impounded under the community-caretaking doctrine."). And it further contends that once the backpack was delivered to the police station, law-enforcement policy mandated an inventory search to further protect Braxton's property. *See, e.g.*, *Kendall*, 14 F.4th at 1124 (explaining that inventory "searches serve several administrative purposes, including 'to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger'" (quoting *Colorado v. Bertine*, 479 U.S. 367, 372 (1987))).

7

The latter point is not in dispute—as the district court concluded, the parties do not "quarrel[] with the need or appropriateness of the inventory" search once the backpack reached the police station. R. vol. 3, 147. Instead, this case turns on whether the officers would have validly impounded Braxton's backpack in the absence of the illegal search incident to arrest. *See United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992) (finding no inevitable discovery because although inventory search was valid, "no inventory of the contents of defendant's vehicle could have been conducted but for the unlawful impoundment of the vehicle"). On impoundment, the district court concluded that the officers were "entitled to take physical possession of" the backpack "on a community[-]caretaker . . . basis." R. vol. 3, 146. The district court dismissed the relevance of Gay's presence and her repeated requests to take possession of the backpack, emphasizing that Braxton never asked the officers to give the backpack to Gay and reasoning that to the officers at the time, the relationship between Braxton and Gay was unclear.

On appeal, Braxton argues that the government did not meet its burden of showing that officers would have impounded the backpack as a matter of community caretaking. We have had many recent opportunities to examine community-caretaking impoundments, albeit in the context of vehicles rather than personal property like Braxton's backpack. *See Kendall*, 14 F.4th at 1122 (citing three recent published cases). Yet the principles from these vehicle-impoundment cases are relevant in the context of personal property. *See Knapp*, 917 F.3d at 1168 (noting that principles articulated in vehicle-impoundment caselaw "apply more broadly" and

8

using such caselaw to review search of defendant's purse); *United States v. Perea*,

986 F.2d 633, 643 (2d Cir. 1993) (noting that for arrests that do not occur at

individual's home, "officers may 'impound the personal effects that are with him [or

her] at the time to ensure the safety of those effects or to remove nuisances from the

area'" (quoting *Cabbler v. Superintendent, Va. State Penitentiary*, 528 F.2d 1142,

1146 (4th Cir. 1975))). Indeed, the parties also frame their arguments around our

vehicle-impoundment caselaw, in particular *United States v. Sanders*, 796 F.3d 1241

(10th Cir. 2015).

Sanders held that impoundment of a vehicle from private property must be

"justified by both [1] a standardized policy and [2] a reasonable, non[]pretextual

community-caretaking rationale." *Id.* at 1248. We begin (and end) our analysis with

the second prong.[3] On that prong, *Sanders* set out a nonexclusive list of factors

relevant to determining whether "a reasonable and legitimate, non[]pretextual

community-caretaking rationale" exists, including:

> (1) whether the vehicle is on public or private property; (2) if on private
> property, whether the property owner has been consulted; (3) whether

---

[3] The government contends that *Sanders*'s first prong does not apply here because we are on public—not private—property. *See Kendall*, 14 F.4th at 1122 ("In one of our recent cases, however, we clarified that the first *Sanders* prong is 'specific to private property impoundments.'" (quoting *Venezia*, 995 F.3d at 1178)). But Braxton asserts in reply that the government waived such argument by not raising it below. *See United States v. Martinez*, 643 F.3d 1292, 1298 (10th Cir. 2011) ("We will not consider a suppression argument raised for the first time on appeal absent a showing of good cause for why it was not raised before the trial court."). In any event, we need not address these issues here because even if the government did not waive its first-prong argument *and* its argument is correct, it still needs to satisfy the second *Sanders* prong; and the same is true if the government did waive its first-prong argument or if such argument is incorrect.

an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Id.* at 1250. These factors help guide the overall question for Fourth Amendment purposes: whether, in the counterfactual world of our inevitable-discovery inquiry, the seizure of Braxton's backpack would have been reasonable. *See id.* ("Protection against unreasonable impoundments . . . is part and parcel of the Fourth Amendment's guarantee against unreasonable searches and seizures.").

Four of these factors apply in a relatively straightforward manner here. First, the arrest took place on public property, so the backpack itself was also on public property. *See id.* Braxton concedes that this fact would weigh in favor of a reasonable community-caretaking rationale for impoundment because the officers obviously could not have left the backpack on the sidewalk. *See Kendall*, 14 F.4th at 1123 (weighing this factor in favor of reasonable community-caretaking rationale for impoundment because it was not "a reasonable option for officers to leave the vehicle where it was," parked on public street). Relatedly, the public location renders the second *Sanders* factor—whether the owner of private property has been consulted—simply not relevant here. *See id.* (omitting second factor from discussion where arrest took place on public property). On the fourth and fifth other factors, the government concedes that the backpack here was not implicated in a crime and that Braxton did not consent to the impoundment. *See* 796 F.3d at 1250. These two factors accordingly would weigh against a reasonable community-caretaking rationale for impoundment.

10

*See United States v. Woodard*, 5 F.4th 1148, 1158 (10th Cir. 2021) (weighing these factors against valid impoundment).

Largely agreeing on these four factors, the parties center their disagreement on the third *Sanders* factor, the existence of an alternative to impoundment. *See* 796 F.3d at 1250. On this point, recall that Gay appeared less than 30 seconds after Braxton called out for his "girl," Gay twice asked to take the backpack, and the officers curtly rejected her requests almost before she could finish her requests. R. vol. 3, 143. Braxton contends that giving the backpack to Gay would have been an alternative to impoundment and argues that this factor weighs heavily against a reasonable community-caretaking rationale for impoundment. In response, the government argues that giving the backpack to Gay would not have been an alternative to impoundment for two reasons: (1) Braxton did not ask the officers to do so and (2) nothing in the record suggests that Braxton and Gay had a relationship that warranted giving his backpack to her.

As to the government's first point, it is true that Braxton did not expressly ask the officers to give Gay the backpack. But we have stated that "[t]he proper inquiry under the third factor is 'whether an alternative to impoundment exists' and *is not focused on who suggested that alternative*." *Venezia*, 995 F.3d at 1181 (emphasis added) (quoting *Sanders*, 796 F.3d at 1250). Braxton's failure to directly ask the officers to give the backpack to Gay is therefore not dispositive. It is just one fact among many, and we do not find it particularly meaningful in light of Gay's physical

11

presence at the scene and repeated requests to take the backpack. Given these facts, a satisfactory alternative to impoundment may have existed.

As to the government's second point, the record does not support the notion that Braxton and Gay's relationship negated the plausibility of this alternative. Gay appeared less than 30 seconds after Braxton called out for his "girl," and the officer who testified at the suppression hearing said that he assumed the person who arrived in response to Braxton's request was, in fact, the person Braxton had asked for—his "girl." R. vol. 3, 143. Other facts support the conclusion that the two had a relationship close enough to merit giving her the backpack: Braxton asked Gay to bail him out; Braxton asked the officers to give Gay the money they found on him; Gay repeatedly asked to take the backpack; Gay at one point referred to the backpack as hers, which suggests that Braxton was carrying it for her; Gay remained nearby during the entire arrest process; Gay asked the police to write her number down; and Gay told the officers her bus pass and identification were in the backpack. These facts suggest that, at a minimum, reasonable officers dealing with the backpack in a lawful manner would have inquired further about whether they should give the backpack to Gay, either by asking Braxton if he wanted Gay to take the backpack or by inquiring into their relationship.[4]

---

[4] The government asserts that the district court made a factual finding that Gay was essentially "a stranger" to Braxton. R. vol. 3, 149. But as Braxton points out in reply, the district court's comment on this point was less than clear. The district court referred to Gay as "a stranger," but not necessarily a stranger *to Braxton*; it could have been pointing out that Gay was a stranger *to the officers*. *Id.* Because of this ambiguity and because this case involves undisputed video evidence of the arrest—in

Importantly, the officer who testified at the suppression hearing provided scant explanation for why—in the counterfactual scenario in which he was not going to search the backpack incident to arrest—he would have refused Gay's requests and would not have inquired further into their relationship or asked Braxton about giving her the backpack. At best, when explaining why he did not ask Braxton if Gay could take the backpack, the officer said it was "not common practice to be handing out personal property of other persons to other people." *Id.* at 93. And it is true that the government produced a department policy stating that "[a]ny officer coming into possession of personal . . . property will bring such property to the [e]vidence and [p]roperty [s]ection[] or an authorized remote evidence locker." R. vol. 1, 28. But the existence of and compliance with such a policy does not by itself establish a reasonable community-caretaking rationale. *See Sanders*, 796 F.3d at 1249–50 ("Protection against unreasonable impoundments, *even those conducted pursuant to a standardized policy*, is part and parcel of the Fourth Amendment's guarantee against unreasonable searches and seizures." (emphasis added)); *Venezia*, 995 F.3d at 1182 (holding impoundment unreasonable despite compliance with policy because policy

the words of the district court, its factual findings "really do[]n't matter . . . because it's all on body[]cam," *id.* at 142—we decline to interpret the district court's reference to Gay as "a stranger" as a factual finding that she and Braxton were strangers to each other, *id.* at 149. And even if we were to do so, we would hold that finding clearly erroneous in light of the strong record evidence—detailed above, *supra* p. 12—that Gay and Braxton were not at all strangers. *See United States v. Martinez-Jimenez*, 464 F.3d 1205, 1209 (10th Cir. 2006) (stating that factual finding is clearly erroneous if it is "without factual support in the record or we are left with the definite and firm conviction that a mistake has been made" (quoting *United States v. Cernobyl*, 255 F.3d 1215, 1221 (10th Cir. 2001))).

"did not grant the officers authority to do what the Fourth Amendment forbids—to impound a vehicle absent a reasonable community-caretaking rationale"). Nor does the policy negate the existence of an alternative to impoundment: The policy defines *personal property* as property that "*must* be held for safekeeping for the owner." R. vol. 1, 27 (emphasis added). And the officer's testimony does not meaningfully explain why, in light of Gay's requests, he needed to impound the backpack to keep it safe for its owner. We thus conclude, on the record before us, that the alternative to impoundment of giving the backpack to Gay weighs heavily against finding a reasonable community-caretaking rationale. *See Woodard*, 5 F.4th at 1156 (weighing this factor against community-caretaking rationale where officers refused, without reason, to let defendant call someone to take his car); *Venezia*, 995 F.3d at 1179 ("Where an alternative to impoundment does not threaten public safety or convenience, impoundment is less likely to be justified by a community-caretaking rationale.").

To recap, the only factor that favors a reasonable community-caretaking rationale for impoundment is that the arrest took place on public property. The remaining factors—an alternative to impoundment, that the backpack was not implicated in the crime, and that Braxton did not consent—cut significantly against a community-caretaking rationale. On these facts, we conclude the government failed to meet its burden of proving that, despite the alternative of giving the backpack to Gay, it was inevitable that the officers would have validly impounded the backpack under a reasonable community-caretaking rationale. *See Venezia*, 995 F.3d at 1182

14

(concluding that existence of alternative rendered impoundment unreasonable); *cf. Kendall*, 14 F.4th at 1123 (concluding that "balance clearly weighs in favor of the reasonableness of impoundment, partly because there were no good alternatives").

The government emphasizes that officers are not obligated to explore alternatives to impoundment, noting that "[t]he reasonableness of any particular governmental activity does not *necessarily or invariably* turn on the existence of alternative 'less intrusive' means." Aplee. Br. 24 (emphasis added) (quoting *Bertine*, 479 U.S. at 374). But this general proposition does not mean that reasonableness does not *sometimes*, depending on the facts, turn on the existence of alternatives to impoundment. Indeed, "we have recognized that impoundment . . . is not reasonable when there are clear and promptly available alternatives." *United States v. Trujillo*, 993 F.3d 859, 868 (10th Cir. 2021); *see also United States v. Pappas*, 735 F.2d 1232, 1234 (10th Cir. 1984) (finding impoundment unreasonable in part because defendant's girlfriend and other friends were present and could have taken custody); *cf. Trujillo*, 993 F.3d at 870 (concluding that where vehicle posed traffic hazard and defendant was alone at 2:30 a.m., officers "were not required to allow [d]efendant to call someone to come pick up the [vehicle] and then, assuming he was successful, wait around for the new driver to arrive" and citing cases with similar facts and reasoning). Moreover, our precedent establishes that officers generally act unreasonably when they ignore or shut down obvious alternatives to impoundment. *See Woodard*, 5 F.4th at 1156 (weighing existence of alternative against community-caretaking rationale where defendant asked officers if he could call someone to pick

up vehicle and officers refused to let him do so without explanation); *Sanders*, 796 F.3d at 1251 (finding impoundment unreasonable in part because "police impounded [defendant's] vehicle without offering her the opportunity to make alternative arrangements, even though she stated that she was willing to have someone pick up the vehicle on her behalf"); *cf. Kendall*, 14 F.4th at 1123–25 (finding impoundment reasonable in part because of absence of alternatives).[5] And the officer here did just that, failing to offer any reasonable rationale for not at least inquiring further about whether Gay could take the backpack.[6]

In sum, because a clear and promptly available alternative existed here, the government cannot show that it would have impounded the backpack under a reasonable, nonpretextual community-caretaking rationale. Thus, the government

---

[5] Braxton additionally highlights a district-court case that held the impoundment of personal property was unjustified by a reasonable community-caretaking rationale in a factually similar case. *See United States v. Knapp*, No. 17-CR-207, 2019 WL 11502454, at *3 (D. Wyo. June 13, 2019) (concluding impoundment was unreasonable in part because friend who was present during defendant's arrest offered to take her purse, but officers talked friend out of it).

[6] A separate aspect of the officer's testimony is also troubling: When prompted to expound on what he would have done had he availed himself of the alternative to impoundment, the officer said that even if he had given Gay the backpack, he would have inventoried it before doing so. The government does not argue on appeal that this on-the-scene inventory search would have led to the inevitable discovery of the gun, and the district court ruled below that any such on-the-scene inventory search would have been constitutionally impermissible. But we note that this testimony suggests that in a counterfactual world without the illegal search incident to arrest *and* without an illegal impoundment, an illegal search would still have taken place. Although by no means determinative, this testimony further supports our conclusion that the inevitable-discovery doctrine does not save the government from the exclusionary rule in this case.

failed to meet its burden to show that the gun would have been legally and inevitably discovered.

## Conclusion

The government failed to prove by a preponderance of the evidence that if the law-enforcement officers had not conducted an illegal search incident to arrest, they would have nevertheless lawfully impounded the backpack as a matter of community caretaking and then discovered the gun during an inventory search. Thus, the inevitable-discovery exception to the exclusionary rule does not apply, and the gun discovered during the illegal search of the backpack must be suppressed. We accordingly reverse the district court's order denying suppression and remand for further proceedings.