**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 3, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

HUNTER TREY VENEZIA,

    Defendant - Appellant.

No. 19-1432

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:19-CR-00220-RM-1)**
_____

Dean Sanderford, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Elizabeth S. Ford Milani, Assistant United States Attorney (Jason R. Dunn, United States Attorney, with her on the brief), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

_____

Before **McHUGH**, **BALDOCK**, and **BRISCOE**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

This is a direct appeal by Hunter Venezia following his conditional plea to one

count of possession with intent to distribute methamphetamine in violation of 21 U.S.C.

§§ 841(a)(1) and (b)(1)(B)(viii). Specifically, Venezia challenges the district court's denial of his motion to suppress evidence found after a traffic stop led to the impoundment and search of the vehicle he was driving. Venezia moved to suppress the evidence recovered from the search, arguing the officers' impoundment of his vehicle violated the Fourth Amendment.

The sole issue on appeal is whether the district court was correct in concluding the impoundment was constitutional. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's denial of Venezia's motion to suppress and remand with directions to vacate Venezia's conviction and sentence.

## I.      BACKGROUND

### A.      *Factual History*

On January 2, 2019, at about 9:00 p.m., Officers David Tubbs and Jason Jewkes, two members of the Lakewood Police Department ("LPD"), were conducting a routine patrol in Lakewood, Colorado. They observed an Audi pull into the parking lot of a motel and then drive to a gas station across the street. Along the way, the driver—who was later determined to be Venezia—committed a traffic violation by failing to signal a turn. The vehicle soon returned to the motel parking lot, and as it did so, the officers observed that the front and rear license plates were not properly affixed to the vehicle's front and rear bumpers; instead, the plates were improperly displayed in the passenger compartment. The officers ran the license plate number through their identification systems, which revealed the vehicle's registered owner was a person named Luis Cuello.

2

Venezia then parked the vehicle in the motel's private lot. The vehicle was "legally parked," was "not obstructing traffic," and did not pose "an imminent threat to public safety." ROA Vol. 5 at 140. The motel and its parking lot were in a high crime area of Lakewood.

The officers approached the vehicle based on the illegal turn they had observed. The officers asked Venezia, the driver and sole occupant of the vehicle, for his license, registration, and insurance. He did not have a driver's license, registration for the vehicle, car insurance, title to the vehicle, or a bill of sale. Venezia told the officers his license was suspended; the officers confirmed that, in fact, his license had been revoked. Venezia presented the officers with his Colorado identification card, and the officers determined he had an outstanding misdemeanor warrant for "a failure to appear on a traffic ticket." *Id.* at 75.

When asked about Cuello—i.e., the vehicle's registered owner—Venezia stated he did not recognize the name. He told the officers he had recently purchased the vehicle from a person named Dustin Estep but had been unable to insure or register it due to the holidays. The officers contacted their communication center in an attempt to reach Cuello by telephone, but the attempt was unsuccessful.

At the suppression hearing, the district court found as a matter of fact that Venezia was the vehicle's owner, and that he had recently purchased the vehicle from Estep, who had recently purchased it from Cuello. But the court further found the officers had no information available to them, at the time of their encounter with Venezia, that would have alerted them to this chain of title.

3

The officers arrested Venezia on the outstanding warrant and impounded the vehicle. Venezia objected to the impoundment. Although he was not a guest at the motel, Venezia indicated that an individual he referred to as his brother was staying there. The officers did not inquire whether Venezia's "brother" (who turned out to be a friend, Christian Kelly) could take possession of the vehicle. The officers also did not ask anyone working at the motel for permission to leave the vehicle in the motel parking lot.

During an inventory search of the vehicle, conducted as part of the impoundment, law enforcement found drugs, drug distribution paraphernalia, a gun holster, and ammunition. Venezia was released on bond, after which he was able to establish his ownership of the vehicle.

### B. *Procedural History*

A grand jury charged Venezia with one count of possession with intent to distribute methamphetamine, among other counts not relevant here. Venezia moved to suppress the evidence recovered during the search, including the drugs. The government opposed his motion.

The district court then held a suppression hearing at which Cuello, Estep, Venezia, Officer Tubbs, and Kelly testified. The court denied Venezia's motion in an oral ruling. The court concluded the impoundment was conducted pursuant to the LPD's standardized, written policies and was justified by a community-caretaking rationale. The court accordingly held the impoundment was constitutional.

Venezia entered a conditional guilty plea to one count of possession with intent to distribute methamphetamine, reserving the right to appeal the district court's denial of his

4

suppression motion. The district court entered judgment on November 5, 2019. Venezia filed a notice of appeal the following day.

## II. DISCUSSION

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. To be reasonable, a search "generally requires the obtaining of a judicial warrant." *Riley v. California*, 573 U.S. 373, 382 (2014) (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.* "The Government bears the burden of proving that the seizure and search were reasonable." *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009); *see also United States v. Sanders*, 796 F.3d 1241, 1244 (10th Cir. 2015) ("The government bears the burden of proving that its impoundment of a vehicle satisfies the Fourth Amendment.").

When reviewing a district court's denial of a motion to suppress, we review findings of fact for clear error, and we view the evidence in the light most favorable to the government. *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017). We review the determination of whether the search and seizure were reasonable under the Fourth Amendment de novo. *Id.*

One exception to the warrant requirement is a search or seizure conducted pursuant to police officers' "community-caretaking functions." In the context of vehicle impoundments, the community-caretaking doctrine arose from the everyday reality that police frequently encounter disabled vehicles or investigate vehicular accidents in which there is no cause to believe that a criminal offense has occurred. *Cady v. Dombrowski*,

5

413 U.S. 433, 441 (1973). Thus, in *Cady*, the Supreme Court recognized that police may impound a vehicle where the vehicle was disabled as a result of an accident, the driver could not arrange for the vehicle's removal, and the vehicle's presence "constituted a nuisance along the highway." *Id.* at 443.

In *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976), the Supreme Court elaborated by providing several illustrations in which the community-caretaking doctrine justifies impoundment. For example, following a vehicle accident, officers may impound a vehicle "[t]o permit the uninterrupted flow of traffic and in some circumstances to preserve evidence." *Id.* at 368. Violation of a parking ordinance may also justify impoundment under the community-caretaking doctrine, provided the parking violation "thereby jeopardize[s] both the public safety and the efficient movement of vehicular traffic." *Id.* at 369. Accordingly, the Supreme Court reasoned that "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.*

In *Colorado v. Bertine*, 479 U.S. 367 (1987), the Supreme Court addressed inventory searches conducted pursuant to a community-caretaking impoundment. The Court explained that *Opperman* does not "prohibit[] the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id.* at 375.

Guided by the Supreme Court's decisions in these cases, we clarified the precise standard for determining the constitutionality of a police-ordered impoundment on private property in *Sanders*: "when a vehicle is not impeding traffic or impairing public

6

safety, impoundments are constitutional only if guided by both [1] standardized criteria and [2] a legitimate community-caretaking rationale." 796 F.3d at 1243.[1]

Here, Venezia argues the officers failed to comply with either requirement, rendering the impoundment unconstitutional for two independently sufficient reasons. The government disagrees. Reviewing de novo, we conclude that the impoundment was guided by standardized criteria, thus satisfying the first prong of *Sanders*. We also conclude, however, that the impoundment was not guided by a legitimate community-caretaking rationale, thus failing the second prong of *Sanders*.

## A. *Standardized Criteria*

Under the first prong of the *Sanders* test, the impoundment of a vehicle, located on private property, that is not obstructing traffic or creating an imminent threat to public safety, is constitutional only if it is "guided by standardized criteria." *Sanders*, 796 F.3d at 1243. The standardized criteria prong "ensures that police discretion to impound vehicles is cabined rather than uncontrolled," and the existence of such standardized criteria is "the touchstone of the inquiry into whether an impoundment is lawful." *Id.* at 1248–49; *see also Bertine*, 479 U.S. at 375.

---

[1] We have recently held that our two-prong inquiry under *Sanders* does not apply to impoundments where there is a "threat to public safety or traffic." *United States v. Trujillo*, --- F.3d ---, No. 19-2212, 2021 WL 1257759, at *9 (10th Cir. Apr 6, 2021). Because the government asserts that the impoundment here was justified exclusively by the risk of theft or vandalism, as opposed to a safety- or traffic-related interest, we apply *Sanders*.

Here, the LPD officers' discretion was cabined by their standardized impoundment policies set forth in their department manual. The specific policy Officers Jewkes and Tubbs relied on states when "[1] the driver of [a] vehicle does not have a valid driver's license[,] . . . [2] the car is registered to another person[,] and [3] the [LPD] agent is unable to verify that the driver has permission to drive the vehicle, the agent is encouraged to impound the vehicle." LPD Policy § 4741(B)(1)(d). Venezia does not argue the LPD's policies provided insufficiently standardized criteria; nor does he argue that, when LPD Policy § 4741(B)(1)(d) is viewed in isolation, Officers Jewkes and Tubbs failed to abide by it. Because the officers' decision fell within the bounds defined by the LPD's pre-existing, standardized criteria, the first *Sanders* prong is satisfied.

Venezia's arguments to the contrary are unpersuasive. First, he argues that Lakewood's Municipal Code (the "Code") prescribes the limits of the LPD's impoundment authority. As such, he argues the LPD's impoundment policies must be interpreted as narrowed by the Code, and any interpretation of the LPD's policies that exceeds the authority the Code confers is invalid. Properly construed in light of the Code, Venezia asserts, "the provisions of [LPD's] policy . . . do not allow for impoundments from private property." Aplt. Br. at 5.[2]

---

[2] Venezia points primarily to section 10.66.190 of the Code:

**10.66.190 Authority to impound vehicles.**

A. Whenever a police agent finds any vehicle parked upon any public street or public right of way in violation of the parking restrictions . . . contained on any official sign . . . or when any vehicle obstructs or interferes with the free flow of traffic, street maintenance, or access of emergency vehicles or

Even if Venezia's interpretation of the Code were correct—an issue of local law we do not reach—his argument is irrelevant under *Sanders*. As indicated above, the concern articulated in *Sanders*—that is, the reason for the standardized criteria requirement—is to ensure that "police discretion to impound vehicles is cabined rather than uncontrolled." 796 F.3d at 1249. And here, the LPD officers' discretion was so-cabined by their written policies. Further, to the extent Venezia argues the standardized criteria prong requires officers to follow procedures that carry the force of law—as distinct from being lawful—our precedents do not support this contention.

*United States v. Ibarra*, 955 F.2d 1405 (10th Cir. 1992), is inapposite. There, the government argued an impoundment was constitutional because it was authorized under a Wyoming statute permitting officers to impound a vehicle where the person in charge of the vehicle was unable to provide for its removal or custody. *Id.* at 1408. We rejected the government's argument because the district court had found the defendant "was in fact able to provide for the removal and custody of his vehicle," and this factual finding was not clearly erroneous. *Id.* at 1409. Thus, the Wyoming statute on which the government

equipment, or when any . . . vehicle which causes or tends to obstruct the free movement of pedestrians or other traffic upon a sidewalk, a police agent may order the vehicle towed to an impound lot . . . .

B. Nothing in this section shall prohibit the towing of a vehicle to the impound lot pursuant to another section of this title.

Venezia argues that because the Code expressly delineates particular circumstances under which the LPD has authority to impound vehicles, it would be an improper interpretation of the Code to infer it implicitly authorizes the LPD to impound vehicles under circumstances not provided for in the Code.

9

relied did not authorize the impoundment. Here, however, the government does not rely on the Code. Rather, the government argues the impoundment was authorized under the LPD Policy; thus, we only address whether the officers acted within that policy, which they did.

*Sanders*'s first prong is agnostic about whether officers' impoundment policies comply with local law concerning impoundments, or whether the policies have themselves been formally adopted as law. Rather, the first *Sanders* prong is concerned simply with whether standardized criteria cabin the discretion of law enforcement officers conducting impoundments, and about whether the law enforcement officers followed them—i.e., whether their discretion was actually cabined. Here, such criteria existed in the LPD manual, and Officers Jewkes and Tubbs followed them. The first *Sanders* prong is therefore satisfied.[3]

---

[3] Neither our prior precedents, nor our decision today, condone bad faith or arbitrary impoundment policies designed to evade stricter local law. In *Sanders* we explained the second prong of the test guards against such bad faith or arbitrary impoundment policies: our rule that "all community-caretaking impoundments [must] be supported by a reasonable, non-pretextual justification . . . ensures that even if the police were to adopt a standardized policy of impounding all vehicles whose owners receive traffic citations, such impoundments could be invalidated as unreasonable under our precedent." 796 F.3d at 1249–50; *see also United States v. Pappas*, 735 F.2d 1232, 1233, 1234 (10th Cir. 1984) (affirming district court's grant of motion to suppress after a vehicle was impounded from a private lot pursuant to a policy that "requires the impounding of any vehicle whenever an arrest takes place, regardless of the circumstances"). The standardized criteria prong, however, serves a distinct purpose—limiting the discretion of the officer on the scene.

## B.  *Community-Caretaking Rationale*

The second prong of the *Sanders* test requires impoundments by law enforcement to be justified by a "reasonable, non-pretextual community-caretaking rationale." 796 F.3d at 1248. This second prong is primarily derived from *Opperman*, which established that warrantless impoundments may be constitutional when "required by the community-caretaking functions of protecting public safety and promoting the efficient movement of traffic." *Sanders*, 796 F.3d at 1245; *see also Opperman*, 428 U.S. at 369 ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.").

This court identified in *Sanders* five non-exclusive factors that courts use to determine whether an impoundment is justified by such a reasonable, non-pretextual community-caretaking rationale:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Id.* at 1250. We review each factor in turn before weighing them de novo.

### 1.  Factor One: Public or Private Property

The first *Sanders* factor weighs against impoundment because the vehicle was located on a private motel parking lot. Public safety and convenience are less likely to be at risk when the vehicle is located on private property as opposed to public property.

Thus, as we explained in *Sanders*, the Fourth Amendment imposes "heightened requirements on police who seize vehicles from private property." *Id.* at 1249.

Accordingly, the district court erred in concluding that a vehicle's location on private property is not a "strong factor." ROA Vol. 5 at 147. The district court apparently reasoned, as the government does on appeal, that *Sanders* applies only to private property impoundments, and thus the first factor will always be satisfied. *Id.* ("I don't think that in and of itself [the first factor] is a strong factor, because if it were, *Sanders* would be a pretty easy case to follow."); Aple. Br. at 31 ("The district court properly observed this factor is not a strong one given that *Sanders* provides the test for constitutional private property impoundments.") (internal citations and quotations omitted).

The district court and the government misunderstand the nature of our holding in *Sanders*. The first prong of *Sanders* is indeed specific to private property impoundments. In *Sanders*, we held that "impoundment of a vehicle located on *private property* . . . is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale." 796 F.3d at 1248 (emphasis added). The factors describing community-caretaking functions under the second prong of *Sanders*, however, apply to "*all* community-caretaking impoundments." *Id.* at 1249 (emphasis added).

A legitimate rationale is always required, whether on private or public property, because "[p]rotection against unreasonable impoundments, even those conducted pursuant to a standardized policy, is part and parcel of the Fourth Amendment's guarantee against unreasonable searches and seizures." *Id.* at 1250. Thus, *Sanders* applies

12

to both private and public property impoundments to the extent it describes when impoundment is consistent with a reasonable and legitimate, non-pretextual community-caretaking rationale. And, as we and other circuits have recognized, such a rationale is less likely to exist where the vehicle is located on private property. *See id.* at 1249 (collecting cases). Accordingly, here, not only does the first factor weigh against impoundment, the first factor is entitled to more than "little weight."

In sum, the first factor weighs against finding the impoundment of Venezia's vehicle was justified by a legitimate community-caretaking rationale.

## 2. Factor Two: Consulting the Private Property Owner

The second *Sanders* factor also weighs against impoundment because the motel owner was never consulted.[4] As mentioned above, public safety and convenience are less likely to be at risk when a vehicle is located on private property. That risk is particularly diminished when the private property owner does not object to the vehicle's presence. For these reasons, we consider the property owner's consent, even if the property owner does not own the vehicle. *See, e.g., Sanders*, 796 F.3d at 1251 (impoundment not justified where "police [could have] consulted the owners of the parking lot about the vehicle remaining where it was"); *Pappas*, 735 F.2d at 1234 (impoundment not justified where bar owner could have kept vehicle on his property until driver returned).

---

[4] Although we refer to motel "owner," someone with authority to speak for the owner—such as the motel manager or other agent—would suffice.

13

The district court erred in addressing the second factor in terms of ownership of the vehicle, rather than the motel owner's interest in the parking lot itself. The district court apparently assigned the second factor little weight because the motel owner could not help the officers determine who, as the district court described it, could "speak for the vehicle." ROA Vol. 5 at 148. This shows that the district court was focused on the ownership of the vehicle, rather than where the vehicle was parked. Yet, questions regarding the vehicle's ownership, and who could speak for the vehicle, are relevant to the fifth *Sanders* factor—whether the owner consented to impoundment. And, as the government acknowledges, questions regarding liability for theft or vandalism are relevant to the third factor—whether an alternative to impoundment existed. *See* Aple. Br. at 32 ("[The motel owner's] permission would have only been helpful to a point in discerning an alternative to impoundment.").

By contrast, the second *Sanders* factor goes to the private property owner's enjoyment of his or her private property, i.e., whether the vehicle's presence caused a nuisance. For example, the community-caretaking interest may permit officers to impound a vehicle that interferes with a private property owner's use or enjoyment of their property. Indeed, the Code appears to contemplate this interest by authorizing police to impound a vehicle that "limits the normal access to use of private property without the express consent of the owner or person in lawful control of such property." Lakewood, Colo., Mun. Code § 10.42.010(A) (2020). In this case, however, the officers could not have impounded Venezia's vehicle based on the motel owner's objection, because the officers failed to even consult the motel owner, or anyone who could speak for the owner.

14

In sum, the second factor also weighs against finding the impoundment of Venezia's vehicle was justified by a legitimate community-caretaking rationale.

### 3. Factor Three: Alternatives to Impoundment

The third *Sanders* factor weighs against impoundment because the vehicle could have remained at the motel parking lot until the motel owner objected to the vehicle's presence, until the officers contacted the vehicle's registered owner, or until there was reason to believe the registered owner could not be contacted and the vehicle would be abandoned. Where an alternative to impoundment does not threaten public safety or convenience, impoundment is less likely to be justified by a community-caretaking rationale.

Here, as the district court found, and as the government asserts, the only alternative to impoundment was to leave Venezia's vehicle in the motel parking lot. Venezia could not speak for the vehicle, nor was there anyone else present who could do so. Thus, it is clear the vehicle could not have been moved. It is unclear, however, why the vehicle needed to be moved at all. The district court found that the vehicle was legally parked, was not impeding traffic, and did not pose a safety hazard. The only reason for impoundment provided by the district court was that the vehicle would have been left "where it is without protection, left in a high-crime area, where the risk of . . . vandalism, theft or other criminal activity . . . is high." ROA Vol. 5 at 157. In this case, the concern over theft or vandalism was not reasonable for two reasons.

First, it was not reasonable for the officers to believe that the registered owner, Luis Cuello, could not be contacted and that the vehicle would be abandoned. Certainly,

15

an abandoned vehicle on a public highway may be at risk of theft or vandalism, and thus may be impounded under the community-caretaking doctrine. *See Cady*, 413 U.S. at 447 (holding that police lawfully impounded vehicle located on a highway, where "like an obviously abandoned vehicle, it represented a nuisance"). And certainly, the officers were unable to contact Cuello on the night of Venezia's arrest.

Yet, the officers could not then reasonably conclude that they would continue to be unable to contact Cuello. Indeed, the district court declined to find that the vehicle was "abandoned." ROA Vol. 5 at 156. Nor does the record indicate that the vehicle was abandoned. The officers only began to contact Cuello by telephone after 9:00 P.M.[5] They gave up on their attempts by 9:45 P.M. at the latest, when the vehicle was impounded. ROA Vol. 1 at 54. The officers' unsuccessful, late-night attempts to call Cuello do not establish that the vehicle would have been left at the motel indefinitely. Accordingly, there is no reasonable explanation for why the vehicle could not remain in the motel parking lot until Cuello was reached, or why the vehicle needed to be impounded immediately following Venezia's arrest.

This case is unlike *United States v. Kornegay*, 885 F.2d 713 (10th Cir. 1989), in several important ways. In *Kornegay*, the officers did not know where the vehicle was

---

[5] During the suppression hearing, one of the officers testified that "[t]here's a possibility that we may have requested . . . an agency in that jurisdiction of the registered owner's address to go out and physically attempt to make contact." *Id.* at 66. The officer, however, had "no personal knowledge or evidence to show that that actually occurred," *id.*, and the district court made no finding specific to physical contact. *See id.* at 142. Accordingly, we do not consider whether the officers also attempted to physically contact Cuello.

registered. The vehicle had a Missouri license plate temporarily fastened over a Louisiana plate. 885 F.2d at 715. Thus, there was no way to determine who the owner was and whether the owner would retrieve the vehicle. Here, the officers identified the registered owner and had means of contacting him. Further, in *Kornegay*, the officers could not identify the driver-arrestee because the driver's license he produced pictured someone else. *Id.* Thus, even if the officers could determine the owner, they had no way of connecting the driver-arrestee to the vehicle. Here, the officers identified Venezia, and thus could have released the vehicle back to him once his ownership was confirmed. Accordingly, this case is more similar to *Sanders*, where we distinguished *Kornegay* by reasoning that "police knew Sanders' identity, place of residence, the origin of her vehicle, and had other reasons to be assured that the vehicle would not be abandoned." 796 F.3d at 1251 (citing *Kornegay*, 885 F.2d at 716).

Second, even though the motel parking lot was in a "high-crime area," the risk of theft or vandalism was not so imminent as to foreclose alternatives to impoundment.[6] There was simply nothing unusual, let alone harmful to public safety or convenience, in

---

[6] We do not hold that a risk must be imminent in other impoundment cases. *See* Dissent at 12. Indeed, as the dissent points out, in other cases, an impoundment may be justified where there is no such immediacy. *Id.* at 12–13 (collecting cases). Yet, immediacy remains a relevant consideration in determining "whether an alternative to impoundment exists," where, as here, the alternative is temporarily leaving the vehicle where it was found. *Sanders*, 796 F.3d at 1250. Just as our overarching inquiry is "the reasonableness of the officers' decision in these circumstances to impound the vehicle for safekeeping until they could determine who owned it," Dissent at 11, our inquiry under the third factor must be "the reasonableness *of the alternative* in these circumstances *of leaving the vehicle at the motel* until the officers could determine who owned it."

17

leaving Venezia's vehicle overnight in the motel parking lot. Ostensibly, doing so would have been no different than what the motel's guests do on a regular basis. In contrast to the motel parking lot at issue here, the parking lot in *Kornegay* belonged to an auction company. 885 F.2d at 716. The risk of theft or vandalism to a particular vehicle is greater where, as in *Kornegay*, overnight parking is unusual, or where the vehicle would be out of place or conspicuous.[7]

Venezia's inability to establish ownership at the time of his arrest did not make his proposed alternative unworkable. The proper inquiry under the third factor is "whether an alternative to impoundment exists" and is not focused on who suggested that alternative. *Sanders*, 796 F.3d at 1250. Because Venezia could not establish ownership at the time of his arrest, he could not mitigate the officers' concerns of theft or vandalism. At the same time, however, Venezia's inability to establish ownership at the time did not exacerbate the risk of theft or vandalism. In fact, police officers generally do not know who owns a parked vehicle. Accordingly, police officers generally do not impound vehicles when they cannot locate the vehicle's owner at 9:00 P.M. The mere absence of a lawful owner does not, on its own, justify impoundment. *See Pappas*, 735 F.2d at 1234 ("*Opperman*

---

[7] We do not question the district court's factual findings. *See* Dissent at 14. We credit the district court's finding that the motel was located in a high-crime area, and that leaving the vehicle at the motel exposed it to the risk of theft or vandalism. We disagree, however, that such a risk, which was common to every car located in the area, foreclosed any "real alternative." ROA Vol. 5 at 149. That the motel's guests regularly park their cars overnight demonstrates such an alternative existed. And we review the district court's application of *Sanders* de novo, rather than for clear error. *Sanders*, 796 F.3d at 1243–44.

cannot be used to justify the automatic inventory of every car upon the arrest of its owner. The justifications for the rule are too carefully crafted for this to be the intent.").

Under the facts and circumstances of this case, leaving the vehicle in the motel parking lot overnight did not expose it to unnecessary risk of theft or vandalism. Accordingly, an alternative to impoundment existed—namely, leaving the vehicle in the motel parking lot until the motel owner objected, Cuello objected, or it became reasonable to conclude Cuello could not be contacted and the vehicle would be abandoned.[8]

### 4. **Factor Four: Implicated in a Crime**

The fourth *Sanders* factor weighs against impoundment because impounding Venezia's vehicle would not have provided further evidence of the traffic violations or outstanding warrant for which Venezia was arrested.

### 5. **Factor Five: Consent of Owner and/or Driver**

Venezia concedes this final *Sanders* factor "arguably favors impoundment." Aplt. Br. at 12. He acknowledges that since "the officers could not determine at the time [of his

---

[8] The dissent asserts that "the question here is not whether the officers . . . could have acted more solicitously . . . but whether their decision was, under all the circumstances, within the realm of reason." *Id.* at 11; *see also id.* at 17 ("[T]he test of reasonableness is whether the officers' decision was, under all the circumstances, within the realm of reason—not whether they needed to impound the vehicle in some absolute sense."). Although not dispositive, we must consider the existence of alternatives when determining whether an impoundment was justified by a reasonable community-caretaking rationale. *Sanders*, 796 F.3d at 1250. Put differently, the existence of alternatives falls within "all the circumstances" under which we evaluate the reasonableness of a community-caretaking rationale.

arrest] that Mr. Venezia owned the vehicle, his consent or lack thereof was not terribly relevant to the impoundment decision. And the officers tried and failed to contact the vehicle's registered owner." *Id.* The fifth factor therefore weighs in favor of finding the impoundment was justified.

6. **Weighing the Factors**

To summarize: the vehicle at issue was legally parked on private property, did not impede traffic, and did not pose a safety hazard. The private property owner did not object to the vehicle's presence. None of these facts are in dispute. Rather, the parties dispute whether leaving Venezia's vehicle in the motel parking lot would have unnecessarily exposed it to risk of theft or vandalism.

As discussed above, the vehicle in this case was not at unnecessary risk of theft or vandalism, and thus the officers lacked a reasonable community-caretaking rationale. The officers could not reasonably conclude that the vehicle would be unattended for a prolonged period of time based on their unsuccessful 9:00 P.M. attempt to call the vehicle's registered owner. And the vehicle's presence in the motel parking lot was no different than any other vehicle in the lot. For these two reasons, the officers' decision to impound the vehicle was not guided by a reasonable community-caretaking rationale as required under the second *Sanders* prong. The officers could no more impound Venezia's vehicle than they could impound any other vehicle at the motel, assuming its driver was unavailable and its registered owner could not be reached that night.

It is unnecessary to decide whether the asserted community-caretaking rationale was also "pretextual." In fact, in this case, the evidence of pretext is scant. Yet, we held

20

in *Sanders* that an asserted community-caretaking rationale must be both "reasonable" and "non-pretextual." *Id.* at 1248. The officers in this case were attempting to rely on their standardized policy when impounding the vehicle. That policy, however, as exercised here, simply did not grant the officers authority to do what the Fourth Amendment forbids—to impound a vehicle absent a reasonable community-caretaking rationale.

* * *

"Ascertaining whether an impoundment is justified by a reasonable and legitimate, non-pretextual community-caretaking rationale is not an easy task." *Sanders*, 796 F.3d at 1250. Yet, in that task, we are guided by the Supreme Court's illustrations of the community-caretaking doctrine in *Cady* and *Opperman*, and this court's enumeration of community-caretaking factors in *Sanders*. Here, reviewing the specific facts of this case de novo, we conclude that the impoundment was inconsistent with the Supreme Court's description of the community-caretaking doctrine, and this court's enumerated factors in *Sanders*.[9]

---

[9] The dissent asserts that *United States v. Johnson*, 734 F.2d 503, 504 (10th Cir. 1984) (per curiam) compels us to affirm. *See* Dissent at 4–5. The government did not cite *Johnson* in its briefing, let alone argue for its application. And, in any event, the night club parking lot at issue in *Johnson* is easily distinguishable from the motel parking lot at issue in this case. So far as we are aware, motel guests are less likely to park for a few hours at night, and more likely to stay overnight at the premises, than night club patrons. Thus, the officers' community-caretaking concerns are less reasonable here than they were in *Johnson*. The out-of-circuit cases that the dissent relies upon similarly address circumstances where overnight parking is less common than at motels. *See, e.g., Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009) (drugstore parking lot); *United States v. Smith*, 2005 WL 2746657 at *4, 05-cr-257, (E.D. Pa. Oct. 24, 2005) (public street obstructing a bus stop), *aff'd* 522 F.3d 305 (3d Cir. 2008); *United States v.*

21

## III. CONCLUSION

For the reasons stated, we **REVERSE** the district court's denial of his motion to suppress and **REMAND** with directions to **VACATE** Venezia's conviction and sentence.

---

*Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004) (parking lot of a business that was closed); *United States v. Ramos-Morales*, 981 F.2d 625, 626 (1st Cir. 1992) (public street outside an unknown building); *United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir. 1980) (mall parking lot). To say these cases addressed "similar circumstances" is generous. Dissent at 1.

No. 19-1432, *United States v. Venezia*
**BALDOCK**, Circuit Judge, dissenting.

Until today, the Fourth Amendment permitted police officers to act as community caretakers and impound an arrestee's vehicle for safekeeping when no one is available to take custody of it and the circumstances present the potential for theft or vandalism. *United States v. Kornegay*, 885 F.2d 713, 716 (10th Cir. 1989); *United States v. Johnson*, 734 F.2d 503, 505 (10th Cir. 1984) (per curiam). To reach its contrary judgment, the Court flouts precedent and turns a blind eye to the numerous decisions of this Court and other courts upholding warrantless vehicle impoundments under similar circumstances. In the process, too, the Court disregards facts, ignores record evidence, and dispenses with our conventional rule that we do not judge the reasonableness of an officer's decision with 20/20 hindsight. Unable to rely on law or facts, the Court is left to substitute its own speculative judgment about why the officers here could not reasonably conclude that leaving the to-be-determined owner's vehicle unattended in a high-crime area for an undetermined length of time could subject it to theft or vandalism. Because this decision is contrary to both precedent and common sense, I cannot agree with it.

\* \* \*

Let's start with what the Court has correct. First, the Court identifies the applicable standard: When a vehicle located on private property "is not impeding traffic or impairing public safety, impoundments are constitutional only if guided by both [1] standardized criteria and [2] a legitimate community-caretaking rationale." *United States v. Sanders*, 796 F.3d 1241, 1243 (10th Cir. 2015). Second, applying that rule, the Court

properly concludes that the officers' decision to impound Mr. Venezia's vehicle was guided by standardized criteria that cabined their discretion in performing their community-caretaking function.

Third, I also agree that some of the factors we outlined in *Sanders*—the vehicle was parked on private property and was not implicated in a crime, and the officers did not consult with the motel owner—weigh against the reasonableness of the impoundment here. *Id.* at 1250. But as the Court correctly points out (and its analysis illustrates), the five non-exclusive factors we listed in *Sanders* are exactly that—some things courts have considered when assessing the constitutionality of a warrantless vehicle impoundment. *Id.* Those factors can serve as a guide in evaluating an officer's decision to impound a vehicle, but they are not the *sine qua non* of a reasonable community-caretaking rationale. Instead, "as in all Fourth Amendment cases, we are obliged to look to all the facts and circumstances of this case in light of the principles set forth in [our] prior decisions." *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976).

Where I part ways with the Court is at the next question: Under the particular circumstances Officers Tubbs and Jewkes encountered, did they have a reasonable, non-pretextual reason for impounding Mr. Venezia's vehicle? Short answer: Yes.

My analysis, of course, begins with the facts of this case. The district court determined that the officers made a lawful traffic stop and properly arrested Mr. Venezia on an outstanding warrant. Mr. Venezia was the driver and sole occupant of the vehicle. He did not have a driver's license—which the officers determined had been revoked—registration for the vehicle, car insurance, title to the vehicle, a bill of sale, or anything

else to suggest he owned the vehicle. When asked about the vehicle's registered owner, Mr. Venezia said he did not recognize the name. The officers attempted to contact the registered owner of the vehicle, but they were unsuccessful. Based on credible officer testimony, the district court found that Mr. Venezia's vehicle was parked in a motel parking lot located in a high-crime area. These findings are not clearly erroneous. *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020) (explaining that we view the evidence in the light most favorable to the government, accept the district court's factual findings unless they are clearly erroneous, and review legal conclusions de novo).

Given these circumstances, the officers could reasonably infer that the vehicle might be the subject of theft, vandalism, or other damage if left on the premises without a responsible custodian. Because no third party was available to entrust with the vehicle's safekeeping, the officers also could not be certain how long the vehicle would be vulnerable to criminal activity in Mr. Venezia's absence. Even if Mr. Venezia did not expect to be in custody long, he would not have been able to operate the vehicle himself on release due to his revoked license. Nor did Mr. Venezia have authority to direct someone to take custody of the vehicle or move it on his behalf because he was unable to establish his ownership.

To be sure, the officers had strong reason to doubt Mr. Venezia was lawfully in possession of the vehicle. And, resisting "the temptation of offering critiques with the 20/20 vision of hindsight," they also had good reason to believe it might take several days, if not longer, to figure out who owned the vehicle. *See United States v. Harris*, 735

3

F.3d 1187, 1191 (10th Cir. 2013) (Gorsuch, J.) (internal quotation marks omitted).

Specifically, the district court found Mr. Venezia had driven the vehicle

> with the [license] plates on the inside, [was] beading sweat, when being . . .
> spoken to by police, [wa]s unable to produce [a] driver's license, registration,
> insurance, bill of sale[,] or anything else[. He] simply sa[id] that he bought
> the car recently, but couldn't get it insured or registered because of the
> holidays, [which] is not much of an explanation, and certainly not one that
> would be unreasonable for the police to refuse to accept at face value.

ROA, Vol. V at 147–48.

At bottom, the officers had two options following Mr. Venezia's arrest: leave the vehicle where it was or impound it. By choosing the second option and transporting the to-be-determined owner's vehicle to a secure location, the officers ensured the vehicle was not left unattended in a high-crime area for an undetermined length of time, during which it could have been stolen or damaged. That was a reasonable choice under the circumstances. And, as the Court recognizes, nothing in the record suggests the officers acted in bad faith or solely for the purpose of investigation in exercising their discretion to impound the vehicle. Thus, as the district court concluded, the officers' decision to impound Mr. Venezia's vehicle was guided by a reasonable, non-pretextual community-caretaking rationale.

Our precedent compels us to affirm. In *United States v. Johnson*, for example, the police impounded the defendant's vehicle for safekeeping after arresting him on suspicion of being in actual control of an automobile while intoxicated. 734 F.2d at 504. The vehicle was legally parked in the parking lot of a night club, where it posed no hazard to public safety or convenience. *See id.* We held that the impoundment was "an

4

appropriate exercise of the 'community caretaking functions' which the police have a responsibility to discharge" because (1) the defendant was unable to move the vehicle and (2) the officers were concerned about vandalism. *Id.* at 505 (quoting *Opperman*, 428 U.S. at 368–69, and *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).

The exact same factors are applicable here. Yet the Court suggests that we should ignore on-point precedent because the government did not cite *Johnson* in its brief. Majority Op. at 21 n.9. We, as neutral arbiters, "rely on the parties to frame the issues for decision." *Colorado v. EPA*, 989 F.3d 874, 885 (10th Cir. 2021) (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)). But "[w]hen an issue or claim is properly before the court," it "retains the independent power to identify and apply the proper construction of governing law." *United States v. Guidry*, 199 F.3d 1150, 1159 n.5 (10th Cir. 1999) (quoting *United States Nat'l Bank v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993)). If the majority wishes to decide this case "according to a truncated body of law, [it] should refrain from issuing an opinion that could reasonably be understood by lower courts and nonparties to establish binding circuit precedent on the issue decided." *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 100 n.5 (1991); *see also United States v. Sabillon-Umana*, 772 F.3d 1328, 1334 n.1 (10th Cir. 2014) ("In cases of conflicting circuit precedent our court follows earlier, settled precedent over a subsequent deviation therefrom." (Gorsuch, J.) (cleaned up)).

Perhaps recognizing as much, the Court goes on to say that *Johnson* is inapposite because that case involved a night club parking lot and this case involves a motel parking lot. But given the facts here, that is a distinction without a difference. The Court ignores

5

that the police had fielded "significant high-priority calls for service," including S.W.A.T. calls, at the motel where the vehicle was parked. ROA, Vol. V at 47. It also disregards that vehicle trespasses and thefts often occurred in the "very immediate area" where the motel and its parking lot were located. *Id.* at 54. What's more, the officers in *Johnson* had no reason to question the defendant's ownership of his vehicle, which presumably was properly registered and insured. Because my colleagues cannot explain why the officers in *Johnson* acted reasonably but the officers here did not, it appears they have resorted to implicitly overruling precedent.

A few years later, in *United States v. Kornegay*, we reaffirmed that theft and vandalism are legitimate community-caretaking concerns even when a vehicle is legally parked on private property and poses no hazard to public safety or convenience. There the officers arrested the defendant while he was inside an auction house attempting to collect proceeds from the sale of two stolen tractors. 885 F.2d at 715. The officers impounded the defendant's vehicle, which he had parked in the auction company's private lot, and conducted an inventory search of its contents. *Id.* The defendant argued there was no need to impound his vehicle because it was legally parked in a private lot, it was not blocking traffic, the auction company had not requested its removal, and his refusal to consent relieved the officers of any potential liability for failure to protect his property. *Id.* We rejected those arguments and held that the impoundment was reasonable because the defendant's true identity and place of residence were unknown; the defendant "was alone, and there was no friend, relative or companion who could be asked to care for the car"; "the vehicle was not parked on [the defendant's] property"; he

6

was unlikely to return soon to take care of the vehicle; and leaving the vehicle in the auction company's lot "could have subjected it to vandalism or theft." *Id.* at 716.

As in *Kornegay*, Mr. Venezia's vehicle was parked in a private lot, it was not blocking traffic, and the owner of the lot had not requested its removal. After the officers arrested Mr. Venezia, no one else was present or promptly available who could move the vehicle or take custody of it. The officers "did not know where the vehicle was from," and leaving it in the motel parking lot "could have subjected it to vandalism or theft." *See id.* Yet, once again, the Court fails to explain why the agents in *Kornegay* acted reasonably but the officers here did not.

The officers' decision to impound Mr. Venezia's vehicle not only falls within the scope of *Johnson* and *Kornegay* but is also consistent with many precedents of our sister circuits finding police impoundment to protect a vehicle from theft or vandalism reasonable. *See, e.g.*, *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1019, 1025 (9th Cir. 2009) (holding impoundment of a vehicle legally parked in a drugstore parking lot a little over a mile from the defendant's home was justified because (1) there was "nothing in the record indicating when [the defendant] could return to the drugstore to retrieve his car" and (2) "[l]eaving [the defendant's] car in the drugstore parking lot would have made it an easy target for vandalism or theft"); *United States v. Smith*, 522 F.3d 305, 314–15 (3d Cir. 2008) (concluding that officers reasonably impounded a vehicle when no one was available to take custody of it, they did not know who owned it, and the vehicle was parked in an area where "vehicles were subject to being damaged, vandalized, or stolen"); *United States v. Petty*, 367 F.3d 1009, 1011–13 (8th Cir. 2004) (upholding

7

decision to impound a vehicle legally parked in a private lot in an area known for narcotics and prostitution because the officers were concerned about theft or damage); *United States v. Ramos-Morales*, 981 F.2d 625, 626–27 (1st Cir. 1992) (Breyer, J.) (upholding impoundment of a vehicle legally parked in a residential neighborhood based on concerns about theft and vandalism); *United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir. 1980) (finding impoundment reasonable when the arrestee's vehicle was legally parked in a private lot but no one was immediately available to take custody of it and leaving it parked overnight presented an "appreciable risk of vandalism or theft").

The Supreme Court itself has also suggested that preventing theft or vandalism is a legitimate community-caretaking reason to impound a vehicle. In *Colorado v. Bertine*, the Supreme Court cited with approval a police policy that prohibited parking and locking a vehicle rather than impounding it "where there is reasonable risk of damage or vandalism to the vehicle." 479 U.S. 367, 376 n.7 (1987). The policy not only "circumscribe[d] the discretion of individual officers," the Court explained, but "also protect[ed] the vehicle and its contents and minimize[d] claims of property loss." *Id.*

Given the law and the facts, it's unsurprising that this Court is unable to explain why this case doesn't meet our community-caretaking standard. The Court gives two reasons for reaching this conclusion, and neither of them withstands scrutiny.

First, the Court tries to distinguish *Kornegay* and liken this case to *Sanders* by pointing out that the officers had identified Mr. Venezia and could have released the vehicle back to him once his ownership was confirmed. I admire my colleagues' attempt to treat like cases alike, as that may be the first and most prosaic duty of the judge. But

8

the problem with the Court's argument is that the circumstances in *Sanders*—and in our related precedents in which we have held impoundments unconstitutional—were meaningfully different from those present here. In fact, the critical distinctions between those cases and this one provide additional support for the conclusion that Officers Tubbs and Jewkes reasonably carried out their community-caretaking duty.

In *Sanders*, the officers did not have to concern themselves with identifying the owner of the vehicle, which presumably was properly registered and insured, because they believed the defendant owned it. 796 F.3d at 1243, 1251. Although the defendant told the officers she would have someone pick up her vehicle on her behalf, and her companion offered to find someone to pick it up for her, the police impounded the vehicle. *Id.* at 1251. Under these circumstances—particularly because the defendant expressed a willingness to accept the risk of a break-in—we determined the officers' concerns about theft and vandalism were unreasonable, pretextual, and therefore could not justify the impoundment. *Id.* at 1251 & n.2.

Similarly, in *United States v. Pappas*, the officers had no reason to question the defendant's ownership of his vehicle, which presumably was properly registered and insured. 735 F.2d 1232, 1233–34 (10th Cir. 1984). Nor did the officers raise any concern that leaving the vehicle in the parking lot of a local bar could have subjected it to theft or vandalism. *See id.* To the contrary, the district court's factual findings suggest the vehicle likely would have been safe in the local bar's parking lot because the defendant was "a well known person in the community" and his family lived nearby. *See id.* at 1234. The district court also found that other unpursued, yet readily available,

9

alternatives to impoundment existed. *Id.* Specifically, the defendant's friends were present and might have taken custody of the vehicle if asked, and the defendant's family could have been called to pick up the vehicle. *Id.* On these facts, we agreed with the district court that the impoundment was unreasonable. *Id.*

Unlike *Sanders* and *Pappas*, where the defendants were lawfully in possession of their vehicles, and clear and promptly available alternatives to impoundment were present, Mr. Venezia had no means of ensuring prompt removal of his vehicle from the motel parking lot. *Cf. Sanders*, 796 F.3d at 1245 (recognizing that in *Kornegay* we "distinguished *Pappas* on the basis that Pappas' associates had ample opportunities to retrieve his vehicle"). The panel cites no case in which this Court or any other court has deemed an impoundment unreasonable when the vehicle's ownership was uncertain, no third party could take custody of the vehicle, *and* leaving the vehicle unattended could have subjected it to theft or vandalism. Indeed, this Court has repeatedly upheld impoundments as reasonable when either the vehicle's occupants were unable to show ownership at the time of the arrest *or* no third party was available to take custody of the vehicle. *United States v. Trujillo*, --- F.3d ---, No. 19-2212, 2021 WL 1257759, at *5 (10th Cir. Apr. 6, 2021) (collecting cases); *see also United States v. Hannum*, 55 F. App'x 872, 873, 876 (10th Cir. 2003) (unpublished) (upholding impoundment of a vehicle legally parked in a private lot under the community-caretaking doctrine because the defendant could not produce proper registration or proof of insurance).

In light of our prior decisions, Mr. Venezia's inability to establish ownership of the vehicle at the time of his arrest weighs strongly in favor of finding the impoundment

10

constitutional. After Mr. Venezia surrendered control over the vehicle, the officers were faced with the choice either of transporting the to-be-determined owner's property to a secure location or of leaving it vulnerable to theft and vandalism. Contrary to the Court's suggestion, the officers were not obligated to conduct a more exhaustive investigation of potential custodians following Mr. Venezia's arrest. Nor were they required to wait until the vehicle was abandoned before impounding it. As the Supreme Court said in *Bertine*: "The real question is not what could have been achieved, but whether the Fourth Amendment *requires* such steps . . . [.] The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative less intrusive means." 479 U.S. at 374 (cleaned up)). In short, I am aware of no precedent that would question the reasonableness of the officers' decision in these circumstances to impound the vehicle for safekeeping until they could determine who owned it.

Second, the Court says the officers acted unreasonably because leaving Mr. Venezia's vehicle in the motel parking lot would not have exposed it to an "unnecessary" risk of theft or vandalism. Majority Op. at 19. But the question here is not whether the officers needed to impound the vehicle in some absolute sense or could have acted more solicitously—as the majority suggests—but whether their decision was, under all the circumstances, within the realm of reason. *Bertine*, 479 U.S. at 374. When the issue is framed correctly, the answer (once again) is yes.

The main problem with the Court's argument is factual. We must read the record favorably to the government and defer to the district court's factual findings unless they

11

are clearly erroneous. *Cortez*, 965 F.3d at 833. Officer Tubbs testified that the police had fielded "significant high-priority calls for service," including S.W.A.T. calls, at the motel where the vehicle was parked. ROA, Vol. V at 47. He also explained that vehicle trespasses and thefts often occurred in the "very immediate area" where the motel and its parking lot were located. *Id.* at 54. The district court credited this testimony and found that the motel parking lot was in a high-crime area. *Id.* at 140, 145. This finding of fact is not clearly erroneous. *Cortez*, 965 F.3d at 833.

When the district court's factual findings and the record evidence are properly considered, it is hard to make a plausible argument that the circumstances encountered by the officers did not present "the potential for theft or vandalism." *See Kornegay*, 885 F.2d at 716. Still, the Court argues that the officers acted unreasonably because the risk of theft or vandalism was not "so imminent" as to require immediate impoundment. Majority Op. at 17. That view is as mistaken as it is novel.

The Court cites no authority to support its theory that the risk of theft or vandalism is sufficient to justify an impoundment only when that risk is "imminent" under the circumstances. *Id.* Such a requirement is nowhere to be found in any of our precedents. What's more, several of this Court's unpublished decisions upholding impoundments as reasonable based on officer concerns about theft or vandalism are inconsistent with an imminent-risk requirement. *See, e.g., Hackett v. Artesia Police Dep't*, 379 F. App'x 789, 793 (10th Cir. 2010) (Briscoe, J.) (holding that, "[u]nder the community caretaking doctrine, concerns about theft or vandalism [were] sufficient to justify impoundment" after the officer issued a citation for driving a vehicle with an expired license plate and

12

the defendant "could not produce a valid driver's license, registration, or proof of insurance"; and rejecting arguments that "it was unnecessary to impound the vehicle because it was parked in a store parking lot, and thus neither impeded traffic nor affected the public safety," and that the officer should have allowed the defendant to call a friend to remove the vehicle on a car trailer); *United States v. Walker*, 81 F. App'x 294, 297 (10th Cir. 2003) (upholding impoundment of a vehicle parked in a private lot where the defendant "was alone at the time of his arrest, there was no one immediately available to move his car to a safe location," and "the vehicle was located in area where it could have inhibited business or been subject to theft or vandalism"); *United States v. Andas-Gallardo*, 3 F. App'x 959, 963–64 (10th Cir. 2001) (finding impoundment reasonable when there was no evidence about how long it might take the defendant or his family to retrieve the vehicle or how safe it would be if left unattended, although the vehicle was properly registered, lawfully parked in a private lot, and did not pose a public hazard or nuisance). The Court acknowledges as much, yet brushes aside this inconsistency. *See* Majority Op. at 17 n.6.

Whatever other problems lurk in the Court's line of reasoning, it rests on at least one other faulty premise. The Court speculates that the "risk of theft or vandalism to a particular vehicle is greater where, as in *Kornegay*, overnight parking is unusual, or where the vehicle would be out of place or conspicuous." Majority Op. at 18. According to the Court, the motel parking lot in this case was a safe haven for unattended vehicles because "the motel's guests regularly park their cars overnight" there. *Id.* Thus, says the Court, a reasonable alternative to impoundment existed. Because no legal authority or

13

factual basis in the record—such as whether cars were regularly parked overnight at this motel—supports this argument, it's unsurprising that Mr. Venezia never made it.

In any event, the Court's argument is flawed for a more fundamental reason: it dispenses with our obligation to view the evidence in the light most favorable to the government and defer to the district court's factual findings. *Cortez*, 965 F.3d at 833. It's unclear from the opinion in *Kornegay* what evidence supported the reasonableness of the officers' concerns about theft and vandalism, or whether the district court made any factual findings about the safety of the area where the auction company's parking lot was located. *See* 885 F.2d at 716. But what we do know is that the district court here made such factual findings based on credible testimony that the motel parking lot was in a high-crime area where vehicle trespasses and thefts often occurred. And on those facts, it strains credulity to say that the officers unreasonably believed that leaving "the vehicle in the [motel's] parking lot—a lot open to the public—*could* have subjected it to vandalism or theft." *Id.* (emphasis added).

The Court fails to explain how the presence of other vehicles in the motel parking lot extinguished the reasonableness of the officers' determination that leaving the to-be-determined owner's vehicle in a high-crime area where vehicle trespasses and thefts often occurred was not a prudent alternative. Such risks are dependent on the character of the parking lot and the propensity for vehicle theft and vandalism in the area—not on the number of nearby targets. After all, the odds of a car being stolen or vandalized are less when it is parked by itself in a remote area with a low rate of vehicle trespass than when it is parked in an area where vehicle trespasses and thefts often occur.

14

The Court also fails to cite a single case suggesting that the officers unreasonably impounded Mr. Venezia's vehicle because it was parked in a location where overnight parking is typical. I am aware of no authority for such a proposition. To the contrary, we—along with other courts—have regularly upheld impoundments under similar circumstances when a vehicle, if left unattended following the driver's arrest, would *not* have been out of place or conspicuous. *See, e.g.*, *United States v. Martin*, 566 F.2d 1143, 1144–45 (10th Cir. 1977) (upholding impoundment of vehicle legally parked on a residential street when the defendant, who had just been placed under arrest for public intoxication, "was in no condition to drive his vehicle" and the other vehicle occupant had been arrested for carrying a concealed weapon); *Ramos-Morales*, 981 F.2d at 626–27 (holding that concerns about theft and vandalism justified impoundment, and rejecting the defendant's argument that the police acted unreasonably because the vehicle would not have been "out of place" where it was legally parked on a residential street "just outside his home"); *United States v. Brown*, 787 F.2d 929, 931–32 (4th Cir. 1986) (concluding that the police reasonably impounded a vehicle legally parked in a private lot that serviced nearby apartments, and rejecting the defendant's argument that the officer should have left the car in the custody of his girlfriend who lived in an apartment building adjoining the lot); *United States v. Cauthen*, 669 F. Supp. 2d 629, 633–37 (M.D.N.C. 2009) (finding that the police reasonably impounded a vehicle for the purpose of protecting it after the defendant's arrest, and rejecting the defendant's argument that the officers should have left his vehicle in the motel's private parking lot where it was legally

15

parked). The Court does not address those decisions—let alone explain what distinguishes this case.

Make no mistake. Officers Tubbs and Jewkes could have ignored Mr. Venezia's inability to establish ownership of the vehicle, brushed aside their concerns about theft and vandalism, and left the vehicle parked in a high-crime area (with its attendant consequences). But given the circumstances they encountered, leaving the to-be-determined owner's vehicle in the motel parking park was not a prudent alternative. While I will not go so far as to suggest that the officers would have been irresponsible if they had not removed the vehicle for safekeeping, a legitimate argument could be made that they would have been. Thus, the third *Sanders* factor—"whether an alternative to impoundment exists (*especially another person capable of driving the vehicle*)"—weighs in favor of impoundment. 796 F.3d at 1250 (emphasis added). And when that factor, along with the others, is considered in light of the totality of the circumstances and our prior decisions, the impoundment here certainly was reasonable.

At bottom, the officers' decision to act as community caretakers and impound the to-be-determined owner's vehicle for safekeeping rather than leave it unattended in an area where vehicle trespasses and thefts often occurred was not unreasonable under the Fourth Amendment. The Court's contrary conclusion is simply wrong.

* * *

I have great admiration for my two distinguished colleagues in the majority. And I recognize that determining whether an impoundment is guided by a reasonable, non-pretextual community-caretaking rationale is not always an "easy task." *Id.* But in my

16

view, this decision jumps the rails. To rule as it does, this Court bypasses precedent, jettisons the district court's factual findings, and ignores record evidence. Along the way, it rejects the longstanding principle that the test of reasonableness is whether the officers' decision was, under all the circumstances, within the realm of reason—not whether they needed to impound the vehicle in some absolute sense. This distortion of our community-caretaking standard does not advance the purposes of the Fourth Amendment or further respect for the Constitution. And neither caselaw nor common sense can sustain it.

Respectfully, I dissent.